## KNORPP v. WAGNER et al., Appellants.

Division One, April 20, 1906.

1. **NEGLIGENCE: Master and Servant: Safe Appliances: Custom.** Where there is an issue as to whether a certain appliance or a certain plan furnished by the master to the servant is reasonably safe, one test is the use in that particular business, and testimony as to what is customary is allowable.

2. ———: ———: ———: ———: **Application of Rule: Mining.** But this general rule does not authorize the admission of evidence tending to show that the usual plan in the mining district for detecting the presence of dynamite in a failed shot was by firing a squib shot in the hole and exploding the dynamite remaining ambushed therein during working hours, if the servant knew the usage in the particular mine was not to fire squib shots during working hours—knew that it was a new mine without an air shaft, and being an experienced miner, knew that, because of the poisonous gases an explosion would generate, a squib shot could not be fired during working hours.

3. ———: ———: ———: **Duty of Master.** The master must furnish reasonably safe appliances to the servant and a reasonably safe place in which to work. But by a reasonably safe place is not meant an absolutely safe place, nor that the master becomes the insurer of the safety of the servant.

4. ———: ———: ———: ———: **Rules.** But the master cannot delegate his primal duty as master by a general order or rule and thus avoid responsibility.

5. ———: ———: ———: **Inspection: Delegation of Duties: Mining.** The master may delegate to an expert servant immediate duties of detail pertaining to his own labor as, for example, the

duty of inspecting his own drill holes and of taking care to ascertain danger and avoid causing accidental explosions.

6. ———: ———: ———: **Assumption of Risks.** The servant assumes ordinary known risks incident to his employment—in this case, the manifold dangers of mining with explosives. All that is required of the master is to exercise ordinary care.

7. ———: ———: ———: ———: **Firing Squib Shot.** An expert miner who accepted service in a mine having no air shaft, where none was practicable and where for obvious reasons the rule was, as he knew, to fire no squib shots during working hours, is to be held, as a matter of law, to have assumed the known risks incident to his employment, unless the accident was due to the supervening negligence of the master.

8. ———: ———: ———: ———: **Supervening Negligence of Master: Reliance Upon Master's Instructions.** The master obtruded himself and gave instructions to the servant to do his drilling in a certain way, and assured him of safety. But the servant's own evidence does not show that the servant relied on that assurance or obeyed the instructions, but conclusively shows that he relied on his own knowledge and did the work in his own way. *Held,* that the case should not have gone to the jury.

9. ———: ———: ———: **Reliance Upon Master's Instructions: How Shown.** Reliance is not a tangible object. It is a state of mind. But a case cannot be permitted to pass off on the statement of the servant that he relied on the master's instructions or a given state of facts. That would be to allow him to decide the case for himself. Whether or not there was such reliance upon his part must be determined from the peculiar facts in judgment. And where the interpreting facts are undisputed, his condition of mind becomes a question of law. And where the servant had the superior knowledge and the facts show that he relied upon himself, although he advised with the inexperienced master, he cannot recover.

10. ———: ———: ———: ———: **Concurrent Negligence.** Where the servant does an act, partly in reliance on his own judgment and partly in reliance upon the master's judgment, and if both be at fault, a resulting injury to the servant from such concurrent negligent judgments is not actionable.

Appeal from Jasper Circuit Court.—*Hon. Hugh Dabbs,* Judge.

REVERSED.

*Thomas & Hackney* for appellants.

(1)   The court erred in admitting evidence over defendants' objection to the effect that failed shots could be tested by exploding powder or squib shots in them.   It appeared from plaintiff's evidence that he had not asked permission to test the hole in question in that manner and further that the reason for not using squib shots in defendants' mine was that the mine was not sufficiently opened up to have an air shaft and the firing of squib shots would foul the air so that workmen could not remain in the ground.   Plaintiff testified that he knew the method of inspecting failed shots was with a miner's spoon, that that was the method adopted at all times during which plaintiff worked for the defendants, and plaintiff could not therefore complain because some other method of testing holes had not been adopted.   Livengood v. Joplin Lead and Zinc Co., 179 Mo. 241; Blundell v. Mfg. Co., 189 Mo. 559; Bradley v. Railroad, 138 Mo. 302; Hollingsworth v. National Biscuit Co., 88 S. W. 1118.   (2)   The court erred in giving the first instruction for plaintiff.   This instruction erroneously declared that it was defendants' duty to furnish plaintiff a reasonably safe place to work in, without regard to the character of the work which plaintiff was engaged in performing.   The defendants were required only to exercise reasonable care to make the place reasonably safe considering the nature and character of the work being done.   Zeigenmeyer v. Lime, etc., Co., 88 S. W. 139; Livengood v. Lead and Zinc Co., 179 Mo. 229; Bradley v. Railroad, 138 Mo. 293.   (3)   The court erred in refusing to give the defendants' refused instruction 1.   This instruction was the correct statement of the law and should have been given.   It was shown by plaintiff's admissions, as well as by the other evidence, that the head machine man was required by defendants to inspect all holes drilled by him and that no one else was intrusted with this very

important duty; that this had been the rule in defendants' mine during all the time plaintiff worked there. It is obvious that it was absolutely necessary for defendants to intrust that particular work to some person skilled in drilling, loading, firing and inspecting holes, and having been intrusted to the plaintiff as head machine man and having been performed by him while in defendants' employ, plaintiff could not complain because it had not been intrusted to some other person nor could he complain of the character of the inspection made by himself. His inspection, therefore, was defendants' inspection. Livengood v. Lead and Zinc Co., 179 Mo. 229; Beford Quarries Co. v. Thomas, 29 Ind. App. 85; Railroad, v. Merriman, 95 Ill. App. 628; Jarvis v. Drake, 97 Ill. App. 153; Pioneer M. Co. v. Thomas, 133 Ala. 279; Railroad v. Graham, 94 Ala. 545. (4) The court erred in refusing defendants' refused instruction 3. If plaintiff knew he was in a better position to determine the danger than the ground boss was and knew that he was more familiar with the nature and character of the drill hole, he had no right to rely on any supposed superior judgment of the ground boss when he knew that that judgment was not and could not be as good as his own. It was the grossest negligence of his own safety for him to go into danger which he himself fully appreciated and he knew the ground boss did not appreciate and he, therefore, took his chances and assumed the risk of his own rash act. Kean v. Detroit Copper, etc., Mill, 66 Mich. 277; Davis v. Railroad, 107 Ala. 626; Coosa Co. v. Williams, 133 Ala. 606; Last Chance Mining Co. v. Ames, 23 Col. 167; Duval v. Hunt, 34 Fla. 85; Roul v. Railroad, 85 Ga. 197; Bell v. Railroad, 70 Ga. 566; Baker v. Railroad, 68 Ga. 706; Writt v. Lumber Co., 91 Wis. 496; Smith v. Railroad, 44 Minn. 17; Patterson v. Railroad 76 Pa. St. 393; Railroad v. Duffield, 12 Lea 63; Jones v. Railroad, 11 Tex. Civ. App. 39; Bradshaw's Adm'r v. Railroad, 21 S. W. 346. If the plaintiff knew that neither the ground boss nor

superintendent had inspected the hole and that the only inspection which had been made was made by the plaintiff, he had no right to rely upon any assurances of safety from either of them. Shawalter v. Fairbanks, 88 Wis. 381. (5) The court erred in refusing to give defendants' demurrer to the evidence offered at the close of plaintiff's case and renewed at the close of all the evidence.

*McAntire & Scott* for respondent.

(1) The court did not err in admitting evidence to the effect that the usual and customary method used in the mining district to inspect or test failed shots is to explode a squib shot or primer in them. If there was any error it was in refusing plaintiff's instructions submitting this issue to the jury, but that was in appellant's favor, the court narrowing the issues. Neither did the court err in refusing the instruction asked by the defendant to exclude this evidence from the consideration of the jury. Plaintiff's petition contained an allegation to the effect that defendants negligently refused to permit plaintiff to use such appliances and precautions. Plaintiff's evidence shows that plaintiff had first asked permission of defendants to test the hole in question by exploding powder or a squib shot in it and that permission was refused, they replying that there was no danger in that old hole, that the powder was all exploded, that it was all right and for Knorpp to go ahead and drill there. Hurst v. Desloge L. Co., 104 Mo. App. 389; Jones v. Railroad, 178 Mo. 549; Omelia v. Railroad, 115 Mo. 205; Huhn v. Railroad, 92 Mo. 440; Kane v. Falk Company, 93 Mo. App. 215; Wigmore on Evidence, sec. 461; Labatt on Master and Servant, secs. 43 and 213; Mason v. Mining Co., 82 Mo. App. 370. (2) (a) The instruction required plaintiff to prove all that the law requires to entitle

195 Sup.— 41

him to recover, and if there was any error in that in-struction it was in appellants' favor, in that it required plaintiff to prove even more than the law requires under such evidence as there is in this case. The first part of the instruction meets appellants' first and second objections because it defines defendants' duty to plaintiff to be the use of ordinary care in inspecting the drift where plaintiff worked so as to render the same reasonably safe in which to work. Herdler v. Buck Co., 136 Mo. 3; Streebe v. Iron Foundry Co., 85 Mo. App. 640; Dewesse v. Meramec M. Co., 54 Mo. App. 476; Dewesse v. Meramec M. Co., 128 Mo. 425; Nicholds v. Plate Glass Co., 126 Mo. 56; Bender v. Railroad, 137 Mo. 250; Hamilton v. Coal Co., 108 Mo. 364; Fisher v. Central L. Co., 156 Mo. 479. (b) The instruction does not overlook the rule of assumed risk, for it tells the jury that they can not find for the plaintiff if they find that the danger, if any, at said place was so open, apparent or glaring that a man of ordinary prudence would have seen or observed said danger and would have refused to work there. Under the evidence in this case we think that the instruction was correct. Hamilton v. Coal Company, 108 Mo. 364; Shortel v. St. Joseph, 104 Mo. 114; Streebe v. Iron Foundry Co., 85 Mo. App. 640; Adams v. Coal Company, 85 Mo. App. 486; Stevens v. Railroad, 86 Mo. 221; Herriman v. Railroad, 27 Mo. App. 435; Bane v. Irwin, 172 Mo. 316; Dewesse v. Meramec Mining Co., 54 Mo. App. 476; Dewesse v. Meramec Mining Co., 128 Mo. 425; Stephens v. Railroad, 96 Mo. 207; Keegan v. Kavanaugh, 62 Mo. 230; Fugler v. Bothe, 43 Mo. App. 44; Lucey v. Oil Co., 129 Mo. 32; Doyle v. Trust Co., 140 Mo. 1. (c) The instruction requires the jury to find that plaintiff exercised ordinary care on his part, and was acting without knowledge of the danger. It required plaintiff to prove even more than the law requires in that it required that the jury must find that the plaintiff acted without knowledge of the danger. An

instruction which requires the jury to find more than was necessary for them to find in order for plaintiff to recover, affords no ground of complaint for defendants. Seawell v. Railroad, 119 Mo. 222; Hurst v. Railroad, 163 Mo. 309; Franklin v. Railroad, 97 Mo. App. 473; Weston v. Mining Co., 105 Mo. App. 702; Smith v. Mining Company, 75 Mo. App. 177; Cardwell v. Railroad, 90 Mo. App. 31; Henderson v. Kansas City, 177 Mo. 477. (3) The first of appellant's refused instruction was properly refused by the court for the reasons: First. All of the evidence in behalf of plaintiff was to the effect that it was the ground foreman's duty to inspect the drill holes. Second. Even if this court should still hold, as it did in the case of Livingood v. Zinc Mining Company, 179 Mo. 229, that defendants could delegate their positive duty of inspection of the place of work., etc., and so escape their liability, still the instruction should not have been given because plaintiff's evidence was to the effect that defendants had never ordered in any manner any one but the ground foreman to do the inspecting, and that while the drillmen did the inspecting, they did so, not because it was their duty, but did so for their own safety, when the ground foreman did not do so. Third. The instruction was further improper because the issue upon which the court confined plaintiff by his instruction, and upon which plaintiff was required to recover, was not whether or not there had been a failure of inspection by any one, but whether defendants had negligently commanded plaintiff to work in an exceptionally dangerous place, after being assured of the safety of the place where they had commanded him to drill. Bayne v. Irwin, 172 Mo. 306; Carter v. Baldwin, 107 Mo. App. 217. (4) The court did not err in refusing to give defendants' refused instruction 3. First. Because plaintiff and defendants were not on an equal footing, and plaintiff had the right, as their employee, to rely on their superior judgment and assurance of the safety of the place in which they

required him to work. Second. The testimony in the case as to the reliance he placed in their assurance was that he relied on their judgment and assurance, and after their assuring him that it was safe, and that the powder was all burnt and there was no danger, he thought it was as they said. He had a perfect right to think so, and the court would have committed error if it had given the instruction which was telling the jury that plaintiff and defendants were on an equal footing, and that plaintiff had no right to rely on their judgment and assurance. Third. Because the question of assumed risk had already been covered by the court in the instruction given. Fourth. Because the question of contributory negligence had been fully covered by the court in the instructions given. Stephens v. Railroad, 96 Mo. 207; Shortel v. St. Joseph, 104 Mo. 114; Malone v. Morton, 84 Mo. 436; Gibson v. Railroad, 46 Mo. 163; Duerst v. Stamping Co., 163 Mo. 607; Hester v. Packing Co., 95 Mo. App. 16; Carter v. Baldwin, 107 Mo. App. 217; McGowan v. Railroad, 61 Mo. 528; Muirhead v. Railroad, 19 Mo. App. 634; Larson v. M. Co., 71 Mo. App. 512; Keegan v. Kavanaugh, 62 Mo. 230; Ferguson v. Railroad, 50 Mo. App. 250; Cox v. Syenite Co., 39 Mo. App. 424; Pauck v. St. Louis Prov. Co., 159 Mo. 467; Walden v. Railroad, 93 Mo. App. 668; Cooley on Torts (2 Ed.), 656; Dean v. Woodenware Co., 106 Mo. App. 180; Labatt on Master and Servant, sec. 440. (5) The case at bar is similar in the issues, the evidence, the instructions, and the result reached, to the case of Bane v. Irwin, 172 Mo. 306, as nearly as any case can be; every defense which is made in this case being made in the same way and manner as in that case, this court should dispose of this case by reaching the same result as it did in that case. (6) (a) The issue before the jury in this case was whether plaintiff had been negligently ordered into a place of danger by defendants' foreman Collins, and their superintendent McRoberts, after an assurance by them of its safety. The instruc-

tions given by the court were proper and submitted to
the jury no issue not raised by the pleadings. The gist
of the first instruction was whether or not defendants
had negligently ordered plaintiff into a place of danger,
after assuring safety. Dowling v. Allen, 74 Mo. 20;
McPeeters v. Railroad, 45 Mo. 24. (b) Plaintiff did
not assume the risk because defendants had assured
him of the safety of the place into which they ordered
him to drill. Stephens v. Railroad, 96 Mo. 212; Duerst
v. St. Louis Stamping Co., 163 Mo. 607. (c) Collins,
the ground foreman in the mine, had control of the work
in which plaintiff was engaged and was the person in-
trusted by defendants to direct plaintiff how, when and
where the work should be done. This constituted Col-
lins a vice-principal, and if he was negligent, defend-
ants are chargeable with the consequences. Miller v.
Railroad, 109 Mo. 350; Russ v. Railroad, 112 Mo. 45;
Cox v. Granite Co., 39 Mo. App. 424.

LAMM, J.—From a judgment of $6150 rendered
in favor of plaintiff, a miner, known as a "drill-man,"
for personal injuries alleged to be received at defend-
ants' hands through certain specified acts of negligence,
defendants, a mining partnership in the Joplin district,
appeal.

One of the assignments of error is that the court
should have sustained a demurrer at the close of plain-
tiff's case, and, failing in that, should have given a per-
emptory instruction for defendants at the close of all
the evidence. This assignment of error calls for an
understanding of the issues and the material evidence.

Omitting mere matters of inducement and descrip-
tive of the environment, the charging part of the peti-
tion, after setting forth certain duties alleged to be
owing from defendants to plaintiff as an employee, is
as follows:

"Plaintiff says and alleges that the defendants,
wholly neglecting and disregarding their duties in that

behalf, neglected to furnish plaintiff a reasonably safe place in which to work; that the defendants negligently failed to inspect the ground of said drift and use ordinary care and precaution to render plaintiff reasonably safe and to inform plaintiff of any and all latent dangers attendant on his said employment; that defendants negligently failed to use ordinary care to supply plaintiff with reasonably safe and sufficient appliances necessary for plaintiff to work in reasonable safety, and negligently refused to permit plaintiff to use appliances and precautions as were necessary for plaintiff to work in reasonable safety; that the defendants carelessly and negligently exposed plaintiff to danger; that the defendants carelessly and negligently commanded and directed the plaintiff to drill and work in an exceptionally dangerous place; that the defendants knowing that the ground where plaintiff was working was defective and dangerous, did negligently and carelessly order the plaintiff to continue work thereat; that all of said defects and danger referred to were known to the defendants or might by the exercise of ordinary care on their part have been known to them; that the same was not known and could not by the exercise of ordinary care on his part have been known to the plaintiff; that on said date, while plaintiff was in the employ of the defendants and while working in the exercise of ordinary care at said point in said drift of defendants' mine, defendants wholly disregarding their said duty to plaintiff, negligently commanded and directed this plaintiff, employed in operating said machine drill, to drill a hole in the face of said drift in said mine at a point where said face had on a previous date been drilled into and the drill holes filled with dynamite or other explosives; that all of the dynamite or other explosives in at least one of said drill holes had not been shot or fired off, of which fact this plaintiff was in ignorance; that defendants failed and neglected to inform plaintiff that all the dynamite or other explosives in at least

one of said drill holes had not been shot or fired off, but that plaintiff having used ordinary care in inspecting said drill hole, and having used every precaution and appliance within plaintiff's control, and which was furnished him and permitted by defendants, and suspecting that there might be danger there, so informed defendants, but defendants assured him that the same was safe and all right, and commanded and directed plaintiff to continue working thereat; that plaintiff, relying on the superior knowledge and assurance of defendants, continued working thereat as commanded and directed, and while exercising ordinary care, the machine drill which he was operating struck the shot or load of explosives so left in the said hole of said face as aforesaid, and thereby caused an explosion, knocking plaintiff down, injuring his body, putting out one of his eyes, paralyzing the other eye,'' etc.

Of the three defendants, one, Wagner, answered by a general denial, a plea of contributory negligence, and averring further that plaintiff was an experienced miner, familiar with the conditions of the drift in which he was working, had caused the condition therein existing and voluntarily assumed the risk of the injuries received by him.

The joint answer of the other two defendants, McRoberts and Best, was a general denial, fortified by a plea of contributory negligence and voluntary assumption of the risk.

The reply put in issues the new matter pleaded in the answers.

Defendants owed and operated a mine known as the Superior mine in a district known as the ''Cornfield'' in Jasper county, and were engaged in exploiting said mine for lead and zinc ore. Appellant McRoberts was the superintendent of the mine and his duties lay on top as well as under ground. Under him was a foreman, Collins, designated as a ground-boss— ground, in this instance, meaning underground—who had charge

in the mine. The word "ground" is also used among miners to designate the stratum of ore-bearing rock being mined. In this instance, the ground was known as "shooting ground," i. e., it was too solid to be manipulated otherwise than by shooting or explosion of dynamite in holes drilled by drilling machines operated by compressed air. The shaft of the Superior mine had been sunk 150 feet. From its bottom, a drift or gallery had been run some distance in the ore-bearing rock, nine feet in height and with a face of sixty feet, and on the bench or face of this drift respondent worked as a "head drill-man," i. e., he ran a drilling machine with the aid of another miner known as a "helper." This drilling machine was movable and was fastened to a column or post wedged from time to time to the roof and floor of the mine and moved as need called. On this post there was an arm and to this arm a clamp or "seat," and to the latter the drilling machine proper was attached. This clamp was movable on the arm and was so arranged that several drill holes could be drilled by moving the machine on the arm. The chisel or drill proper is called a "steel." Some of these steels were, say, a foot long and were called "starters," i. e., they started the drill holes. After starting a drill hole the starter is removed and the main steel inserted in the drill machine. These principal steels varied in length. The one in use in this case would drill a hole, say, five feet in depth. The drill holes had a tip or dip down, enough "to carry water," but were substantially level with the floor, though the machine could be adjusted to work crab-fashion, i. e., to bore up, down or sidewise. The angle of this dip was optional with the drill-man, the object to be attained being to have the dip at such an angle as to carry water (for a reason unknown to us) and at the same time to get an even distribution of the force of the explosion from the collar down to the bottom of the hole and produce a better break of "dirt." The mouth of a drill hole is called a "collar." The

method of blasting or breaking ore-ground was to insert sticks of dynamite or giant powder in these drill holes and tamp them in. When filled with dynamite to, say, within a foot of the collar, a fulminating cap was inserted and a fuse, which latter projected beyond the collar to be lit at firing time. Sand and gravel were then tamped about the fuse, and the affair was ready to explode. The Superior mine was a new mine and we speak advisedly when we say that the uncontradicted evidence of appellants showed it had not developed far enough to provide an air shaft, though to what state of development a mine should come before an air shaft could be provided, is not shown. Because of the absence of this air shaft, orders were given (and it was a rule in that mine) that dynamite should not be exploded during working hours. The mine ran no night shift and therefore the dynamite charges were fired at quitting time of an evening, since to explode dynamite or giant powder in a mine without an air shaft made the mine smoky and the air impure and unfit for use.

Plaintiff was a skilled miner — in fact, considered himself the best in appellants' employ. He had worked in all the branches of mining labor from "shoveler" up to ground-boss, had been "powder-man" and understood the effect and the handling of mining powder; and had been a drill-man for three years and was highly proficient as a driller. He had been in appellants' employ for some time as a drill-man and knew the usages and customs of that mine; knew there was no air shaft; knew that powder was not allowed to be exploded during working hours; and knew that each drill-man was required, by custom or by direct order, to inspect his own drill holes and the effects of firing his own charges. The importance of this inspection will be apparent when we state that now and then, when a fuse was lit, and the fulminating cap exploded, the dynamite would not explode, but might become in part what was known as "burnt powder," i. e., dead powder. Some of the

dynamite might not burn but would remain alive and susceptible of being exploded. Such abortive shot was called a "failed shot" and the operator must be on the *qui vive* and take extreme care that the live dynamite in such failed shot might not explode to his injury or that of his fellow-workmen.

There is a mining tool known as a "spoon," *i. e.*, a contrivance with a long handle of steel, drawn and rounded out at one end into a ladle or bowl like a tablespoon. The cutting steel has a bit of about one and one-fourth inches and cuts a hole about one and one-half inches in diamater and this spoon is of a dimension to be inserted into such hole. There is some divergence in the testimony about the length of the particular spoon used by the respondent in a way presently to be stated, but the length of that particular spoon handle is immaterial, though it is the personal view of the writer that one who handles dynamite with a spoon needs one with a long handle—the longer, the better. If authority is necessary for this judicial *dictum,* it may be found in the Danish proverb to the effect that he who eats out of the same dish with the devil needs a long spoon. In the case at bar, it is not contended by respondent that he did not know the length of his spoon handle, that he complained of its length, or asked for one with a longer handle; and, moreover, the evidence shows that the depth of the drill hole was within the discretion of the operator and could be regulated so as to correspond with the length of his spoon, the use of which is now to be pointed out. This spoon was used to explore a drill hole where there had been a failed shot and remove therefrom both the burnt and unexploded powder, so that the hole might be reloaded or made safe. Sometimes there were crevices, seams or pockets in or crossed by these holes and the dynamite from the failed shot might get into them and could not be removed or detected by the spoon. These crevices, seams or pockets were found in what is known as "shelly" or

"cavy" ground. In some mines in the Joplin district, where air shafts existed, after a shot failed, it was customary to explode the remaining dynamite, if any, by a small charge known as a "squib shot," but this squib firing, of course, fouled the air, in the absence of an air shaft, and was not in use in the Superior mine. As said, respondent knew it was not in use and he knew that the custom was for each head drill-man to inspect his own holes.

On the first day of September, 1900, of a Saturday evening, respondent had drilled and loaded a number of drill holes in the bench or face of his drift. At quitting time, he fired them. On Sunday no work was done in the mine. On Monday he worked in a different part of the drift. On Tuesday morning he commenced work anew at the same part of the drift in which he had been "breaking dirt" or ore on Saturday night. At this time he discovered that a shot, in a certain one of his Saturday night drill holes, hereafter named the "old hole," had been a failed shot, and broke no ground. His present intention, as we understand the record, was to clean out this hole and put in a new charge to be fired that evening, or else make it safe. To this end, he explored the hole with his miner's spoon. It should be noted that when driling the hole on the previous Saturday he discovered the ground, a foot or two in from the collar, and thence to the bottom or far end of the hole, appeared to be shelly and this became apparent from the coarseness of the cuttings from the drill. While spooning out the hole Tuesday morning, he discovered a choked condition from burnt powder and removed about a quart of such stuff. He also established the fact, first hinted at by the drill cuttings, that the ground through which his drill had passed was shelly. He cleaned out the hole, according to his story, as far back as the spoon would go, say, between four and five feet, but the evidence leaves us in the dark as to whether he knew he had explored this hole to the bottom, in other

words, whether he had reached in as deep with the spoon as his steel had gone in drilling the hole. Be that as it may, such condition of things presented itself to his mind as indicated the possibility of a crevice or pocket (undiscoverable with a spoon) in which dynamite might be lodged, whether burnt or live dynamite, if such there be so hid in a pocket, would be unknown to him. This exploration was made in accordance with the known custom or order in that mine, charging the drill-man with the responsibility of inspecting his own holes.

This was early in the morning at the commencement of his day's labor. He was about to set his machine to bore a hole parallel with the old hole, when, according to his story, the superintendent appeared on the ground and there ensued a conversation which respondent gives different shadings to. The substance of it may be gathered from what he said at one point in his testimony, thus:

"Q. Now, Mr. Knorpp, since you have given the condition there, you may state to the jury, in your own way, everything that occurred on the morning of the 4th of September, when you were injured. A. Mr. Collins, the ground-boss for the company, showed me where to set up. He came and showed me where to set up my machine and drill to the right of this old hole. I was making preparations to set up and had my post up, and Mr. McRoberts came in the drift and advised me to change my position, and set to the left and drill across this old hole, and I told Mr. McRoberts at the time—I examined the ground, spooned the ground—spooned the hole, and found burned powder, also cavy in the shaft, and to my judgment it would be dangerous to drill there, and he said it was all right; to set up the machine and go ahead. And I set up the machine and drilled the first hole from the inside of the column or post, and swung the machine to the left and run the machine out on the arm and drilled the starter, as we

term them, in the new hole; after running the starter in the new hole, I went to Mr. Collins, ground-boss, and asked him to come and examine the ground. He came over and looked at the ground and said it was all right and go ahead. I then started the machine, and didn't seem like but a very few minutes until the explosion occurred.'' Being pressed on what he said to Collins, he said he told him to come and see the ''run of the hole.''

The last accurate vision this man had (or, for the matter of that, ever will have) was that of a tongue of fire shooting out, literally, like lightning, to lick him in the eyes and face. For a long time thereafter he was blind and had to be lead about. By and by, through delicate surgical operations, particles of dirt, sand and burnt powder were taken from the front of his eyes. His general health and strength were not impaired and his actionable injury, if any, was confined to his eyes and vision, with the acute and indescribable agony pertaining to a burning, traumatic injury to his eyes. One of the learned specialists, Dr. Tiffany, described the condition of his eyes to be a dense opacity of the cornea, also of the crystalline lens. That the iris adhered to the capsule of the lens. That at first he could discern an object passing before the right eye but not sufficiently to distinguish it. That the left eye had a mere perception of light. An operation called ''iridectomy'' was performed. That is explained to be that a piece of the iris was taken from each eye and the chrystalline lens removed from the right. It finally resulted that respondent, with the aid of glasses, could see to go about alone with his right eye. The extent of his vision in that eye was 20.70, while with the left eye he became able to count fingers one foot away and his vision was 1.200, and might be improved, possibly, by another operation. But the opacity remained and his injuries were lasting. As no question is made on the amount of the verdict or the extent of his injuries, this phase of the case need not be further dwelt on.

At the trial, respondent was allowed to prove, over the objection of appellants, that the usual custom in the other mines in the Joplin district was to test for unexploded powder in a failed shot by exploding squib shots in such drill hole. Appellants, having tried and failed to exclude such testimony, asked the court by instructions to withdraw it from the jury; these instructions were refused and they excepted as they had done to its admission.

Going back a little in the story of the case, it substantially appears, not only that the angle or dip of the drill hole as well as its precise location are optional with the drill-man, but that on respondent's theory he was ordered generally to drill at right angles, *i. e.*, directly across the old drill hole. He did not construe this instruction as mandatory upon him to drill *through* the old drill hole in crossing it, or to make his hole at any given point. He conceived such a course, *i. e.*, to drill through the hole, to be dangerous and exercising his discretion to disobey the letter of the command, he first drilled a hole, which he called a "lead hole," across the old drill hole by shaping its course so as to run six inches below, thinking thereby to avoid the lurking danger, if any. The drilling of the lead hole was successfully accomplished. He then moved his drill to such a distance that another hole, contemplated, when completed would run across the line of the old drill hole about four feeet from its collar, and again adopted a similar angle and inserted his starter six inches below a horizontal plane running through the collar of the old drill hole. When the starter bit was run out, and he was about to change to his principal steel, he went to Collins, the ground-boss, and told him to come and see the "run" of his hole. Collins had been present at a prior conversation with McRoberts. Collins came, glanced at the work, made no inspection of the old hole then or at any time, and said "all right" and "go ahead." Respondent says he relied on these orders

(McRoberts' and Collins') for his safety, and, so relying, put in his principal steel and presently when his machine had made, say, thirty revolutions, the explosion came.

By one witness, Marvin, a discharged employee, whose deposition is in the case, respondent showed that he, respondent, had asked permission to fire a squib in the hole, which permission was refused him. But respondent himself had no recollection of making such request or being subjected to such refusal. He puts his case on the ground that the rule or custom forbade fireing in working hours and acted on the custom. By one of respondent's witnesses, to-wit, his helper, Evans, it was shown on cross-examination by appellants' counsel that he, Evans, who had also been injured and had a suit pending for his injury, had gone to respondent some three weeks after the accident and had inquired of him whether he had discovered burnt powder in the old hole at the time he had spooned it out and inspected it. Respondent told him that he had discovered no burnt powder at that time. In rebuttal, respondent denied making such statement to Evans. Based on these contradictions between respondent's witness, Evans, and himself, and between respondent's witness, Marvin, and himself, certain contentions are insisted upon by appellants that will be considered further on, if necessary.

We have prepared an outline sketch to accompany this opinion, which may aid somewhat in understanding the word picture of respondent and his witnesses. (It seems that the face of the drift was not even, but had been exploded into angles, so that, by proper shooting, dirt could be better broken. The scene is laid at one of these angles in the face of the drift.)

Referring to the above diagram, let ABC be considered such angle and the section of the face of the drift in question. Then the point D might be considered the place where respondent intended to drill on Tuesday morning but was prevented, as he says, by the superintendent.

Let the dotted lines EKF represent the old hole, and the dotted lines HG represent the first or lead hole drilled by respondent Tuesday morning at right angles to the old hole. On that hypothesis G would represent the collar of such lead hole, which was started six inches below a horizontal plane passing through E, the collar of the old hole.

Say the dotted lines, KI, represent the hole respondent was drilling when his steel cut to K and there exploded the old charge in EKF.

The collar of KI also started six inches below a horizontal plane passing through the collar of the old hole. When the hole, KI, reached the point K, it would be six inches below the old hole and about a foot, as we calculate it, from the bottom of the old hole at F.

At the time of trial, the ground-boss, Collins, had disappeared and was not a witness. The superintendent, McRoberts, testified in substance that he went down the shaft and into the drifts of the mine, as usual, Tuesday morning. That when he got on the ground he found respondent, with his machine already set up, drilling at right angles across the line of the old hole. That he noticed a yellowish substance had run out of the collar of the old hole, like molten tallow, or, as elsewhere described in the testimony, of the color of amber, indicated burnt powder. That he thereupon protested to respondent against his drilling across that old hole. His protest and the response of respondent thereto are formulated by himself, as follows:

"Q. I wish you would tell the jury where he was standing when you went to him that morning—when you first saw him that morning in the ground? You heard his testimony about moving from one point to another? A. As near as I can remember—I suppose we may take this table to illustrate—when I got to Knorpp, I am not sure about the time, but along about eight o'clock, between eight and nine o'clock somewhere—he was set up and he was standing back of his machine and it was running and his drill was pointed almost straight south as near as I can tell from going into the ground, and when I went there his machine was running and set so as to drill practically square in on the hole that had been drilled at right angles previously; and I spoke to him very sharply, and I said: 'Bill, what in the devil do you mean by drilling in that hole when you know the powder has been burned in it?' And he said, 'The hole is all right and I know it

195 Sup.—42

is all right.' And I said, "You ought not to drill there anyhow.' And he said, 'I know the hole is all right.' And just then somebody called and said I was wanted on top. . . .

"Q. Did Mr. Knorpp tell you anything about having found burned powder in the hole? A. He did not. He stated that they had examined the hole and cleaned it out and it was perfectly safe and clean.''

It was shown that McRoberts, the superintendent, was not an experienced miner and that respondent knew that fact, and that he went on top at once after his interview with respondent and was not present at the accident. It was shown on appellants' side, and remained uncontradicted, that appellants paid more than customary wages in order to get proficient men—men with discretion arising from experience in handling dangerous explosives in their work and skilled in mining. The case, too, went to the jury on unquestioned evidence showing that the drill-man, if experienced and possessed of sound judgment, could tell better than any foreman or boss the condition of the inside of a drill hole, the condition of the ground through which a drill passed, and was a better judge of the danger of pockets, seams and crevices in which unexploded powder might lurk. All the testimony tends to show that respondent knew that the old drill hole had been inspected by no one but himself. And all the testimony tends to show that neither the ground-boss nor the superintendent knew anything of the condition of the old hole except from the information given by respondent to them by word of mouth. This statement, however, must be modified by the inference arising from the superintendent's own testimony, showing that he saw the stain of burnt powder in the mouth of the old hole, and further modified by the patent fact that both the ground-boss and the superintendent knew, as a visual fact, that there had been failed shot.

Assignments of error are predicated of the giving

of instructions for respondent and the refusal of instructions for appellants, and these instructions will be considered, if necessary, further on.

On the foregoing statement of facts and issues, was the case entitled to go to the jury? And if entitled to go to the jury, was it put to the jury in correct form?

(1) When there is an issue as to whether a certain appliance or a certain plan furnished by the master to the servant is reasonably safe, one test, allowed by the law, is the use in that particular business, and, hence, testimony as to what is customary usage is directed to the issue and becomes of obstinate significance. Respondent insists this general rule authorizes the admission of evidence tending to show that the usual plan and use in the Joplin mining district were to detect the presence of live dynamite in a failed shot by firing a squib shot in the hole and exploding the remaining dynamite, if any there be, ambushed therein. To this contention appellants reply, in effect, that the test of general use or custom should not be applied in this case, because respondent knew the usage in this mine was not to fire such squib shots during working hours, and that knowing this usage he voluntarily assumed the risk by accepting, and continuing in, the employment of appellants. The evidence is all one way that the rule and custom in the Superior mine was not to fire squib shots. The evidence is also all one way that the general custom in the Joplin district was to fire squib shots. Some of the witnesses say that express orders had been issued to fire no shots during working hours in the Superior mine. Other witnesses put it that it was the custom, ruling the operation of the mine, to fire no such shot during working hours.

It goes without saying that general principles of law may not be applied mechanically, but, in order to produce a just result, they should be applied in accordance with their underlying reason and with an eye to the shifting circumstances in judgment, since it is ax-

iomatic that where the reason of the law ends, the law itself ends. For instance, this case went to the jury on the unquestioned testimony of appellants that it was a new mine and had not developed enough for the use of an air shaft. As said, we are left in ignorance as to what stage of development was necessary in order to employ an air shaft. But, if this mine had reached such stage of development, the duty rested upon respondent to show it and to contradict the testimony of appellants in that behalf. If it be assumed that an air shaft was not practicable in this mine, it is not going too far to assume that respondent, an experienced and practical miner, knew such fact. Now, it is a matter of common knowledge that an explosion of powder fouls the air. Without an air shaft to draw off the poisonous fumes of a giant-powder explosion, all work in such mine would be stopped by the sporadic explosion of shots during working hours. Respondent, it seems to us, having been forewarned of the usage in the Superior mine and having obeyed the same and continued in the employ of his master under prevailing conditions, was not at liberty, as a general proposition, to introduce evidence of the usual custom in other mines, at least, without first showing that the condition prevailing in such other mines, relating to riddance from foul air, was the same as the condition prevailing in the Superior mine. The evidence introduced of the custom of firing squib shots in other mines did not show or tend to show that the condition in such other mines was the same, nor did the custom of exploding squib shots during working hours in mines having air shafts tend to show that such custom obtained in mines where there were no air shafts.

But we are met with a singular condition of things in this case, viz: respondent himself disavowed having asked for permission to fire a squib in the old hole. He stands in his testimony upon the theory that he had inspected the hole with a spoon and had discovered a

dangerous existing condition with such spoon; that in the presence of this discovery of danger, of which he informed his master, he was assured the danger was imaginary and was told to go ahead and drill across the old hole; and that he relied upon the master's superior position and knowledge, and, so relying, met with this mishap, and, therefore, is entitled to compensation. But respondent had a witness, named Marvin, who testified by deposition to the effect that at the very time of the accident respondent applied for the privilege of violating the custom, and, in his emergency, using a squib shot and the privilege was denied him and he was commanded to go ahead with a cross-drill hole under assurances of safety. In this anomalous divergence of testimony, we are met with the query whether respondent was not entitled to go to a jury on the testimony of Marvin that a request was made for a squib shot? And the further query arises whether, on Marvin's testimony alone, it was not pertinent evidence in the case to show the customary use of squib shots?

We have no doubt about the proposition that respondent and his witnesses may not agree and yet, for all that, the case be a proper one for the jury, if there be competent evidence from any witness to entitle the case to go to the jury. A suitor is but a witness, after all. Time was when a party litigant was not entitled to testify and must rely solely upon the evidence of others. A suitor, being but a witness, may be allowed to have the common infirmities of his kind, *e. g.,* lapses of memory, inability to see things precisely as others do, and may not hear or may forget things actually said or done. It would be a harsh rule that would cast a litigant because he did not agree *in toto* with his witnesses. Would it not be a premium on a *forced* agreement between witnesses, to announce or apply such a doctrine? In fine, it seems to us that there may be too much of a good thing in the way of agreement—so much, indeed, as to become a badge of suspicion of the

dove-tailing of their tales together. The trouble for respondent, in this view of the case, is in the doctrine of assumed risk and in the discriminating application of the rule that a master is entitled to obedience at the hands of his servant, presently to be considered, and which, in our opinion, renders it unprofitable to further pursue the question of the admissibility of this class of evidence or to consider whether or not it was error to refuse appellants' instructions withdrawing such evidence from the jury.

(2) Was there any case for the jury? The unbending rule is that respondent is entitled, on a demurrer to the evidence, to every favorable inference of fact naturally to be drawn from the evidence, and that, if the facts be disputed, the jury, and not the court, is the arbiter. So, too, the jury and not the court must judge of the weight of the testimony and credibility of witnesses. Hence, in determining the question now up, we must put away from us so much of the evidence of McRoberts as is controverted.

If, however, the substantive facts are undisputed, or if reasonable men can draw only one inference from the facts proved, the matter may resolve itself into a question of law.

Attending to these guiding principles, we confront other rules of law, for instance, the master must furnish reasonably safe appliances to the servant and a reasonably safe place in which to work. As to this, all the books say that by a reasonably safe place is not meant an absolutely safe place, nor that the master becomes an insurer of the safety of the servant. Such a doctrine, applied to the everyday affairs of men, would smite business, in workshops and mine, with incurable paralysis.

Another thing, it is fundamental that a master can not delegate his primal duties as master by a general order or rule and thus avoid responsibility. If the courts would tolerate such ready-at-hand scheme of easy

avoidance, then the employer of men might well add a new and worldly significance to the lines of the good old hymn:

> This is the way I long have sought,
> And mourned because I found it not;

for a cure-all for not a few of his ills lies in a stroke of his pen.

With this general proposition conceded, it is asserted by respondent that appellants could not delegate the duty of inspecting drill holes so far as to relieve them from liability for negligent inspection. But is it sensible, or will it do to say that an expert servant may not have delegated to him intermediate duties of detail *pertaining to his own labor,* as, for example, the duty of inspecting his own drill holes and of taking care to ascertain danger and avoid causing accidental explosions? This precise question was before this court in Livengood v. Lead & Zinc Co., 179 Mo. 229, and Fisher v. Cent. Lead Co., 156 Mo. 479, and ruled against respondent's insistence after full consideration. Indeed, of all persons in the world, the drill-man, because of the law of self-preservation and because of his peculiar and personal knowledge of the hole, would be the most keenly alive to hidden peril and be the most likely to smell it out, *i. e.,* would make the best inspector of his own drill holes. Respondent's complaint of the method of inspection, therefore, is not well founded. His inspection of the old drill was the inspection of his master and he must not be heard to complain of the method, *i. e.,* the spoon method, for it was in use to his knowledge; nor of the character of the inspection, for it was his own act; and he may not complain that the master did not otherwise inspect the hole, because he knew and voluntarily adopted the plan of inspection by the drill-man; and what is more, he knew that no one had inspected that hole but himself.

Again, the servant assumes the ordinary, known risks incident to his employment—in this case, the man-

ifold dangers of mining with explosives. All that is required of the master is to exercise ordinary care. Now, as to one phase, at least, of the question of assumption of risks, the case is free from doubt, thus: respondent, an expert miner, with wide-open eyes, who having eaten the fruit of the tree of knowledge of good and evil (in mining) voluntarily accepted and continued in the service of appellants in a mine having no air shaft, where none was practicable and where for obvious reasons the rule was to fire no squib shots during working hours. That by his conduct he must be held, as a matter of law, to have assumed the known risks incident to that employment in that way, ought to require no argument.

But respondent did not assume the risk of any supervening negligence of the master, and this precise point is said to be the turning point in this case; for it is asserted by respondent that the master obtruded himself and negligently commanded him to do a certain thing in a given way and negligently gave him assurances of safety, upon which he relied. Rejecting the evidence of appellants, wherein it is controverted, and attending to the evidence produced by respondent, it may be said that the command is shown and the assurance of safety is shown. The crucial point is, whether respondent could have relied upon such assurance. In other words, did he have the right to rely upon appellants' assurances, i. e., was it reasonable for him to rely thereon, and did he rely thereon?

If there could be two opinions among reasonable men about the reliance of respondent being reasonable, or existing as a fact, then the case under respondent's evidence was for the jury; otherwise, not. To this complexion the case has come and the point in hand, while exceedingly narrow and nice, lies at the root of the matter. It can be solved alone by considering the peculiar facts in judgment. Reliance is not a tangible fact that one can put his finger on, or see with his eye. It

is a state of mind and, for the practical purposes of the law, a state of mind must be got at and interpreted through acts, if acts there be. Proof cannot reach mere conditions of mind as long as they are undeveloped by action. If a certain state of mind is in issue, to allow a case to pass off on the mere *ipse dixit* of the person, that his mind was thus or so, would be to allow him to decide the case for himself, and the court and jury would have nothing to do but to enter a verdict.

On principle, we can not see why, if the interpreting acts are undisputed, the condition of mind may not resolve itself into a question of law. In other words, if the respondent's acts show that he could not and did not place reliance upon the assurances of his master, the court would be within its province when it said there was no evidence of that condition of mind. Further, it looks to us like a truism that if one does an act, partly in reliance on his own judgment and partly in reliance upon another's judgment, and if both be in fault and negligently pronounced, a resulting injury from such concurrent negligent judgments is not actionable.

In the light of these views, let us briefly recur to the facts and the allegations of the petition. The petition states that defendants negligently failed "to inform plaintiff of any and all latent dangers attendant on his said employment; . . . that of all of said defects and dangers referred to were known to defendants; . . . that the same were not known and could not by the exercise of ordinary care on his part have been known to plaintiff; . . . that all of the dynamite or other explosives in at least one of said drill holes had not been shot or fired off, of which fact this plaintiff was in ignorance; that defendants failed and neglected to inform plaintiff that all dynamite or other explosives in at least one of said drill holes had not been fired or shot off; . . . that plaintiff, relying on the superior knowledge and assur-

ance of defendants, continued working thereat as commanded and directed," etc.

In pleading plaintiff's ignorance and defendants' knowledge, the learned counsel for respondent doubtless had in mind pronouncements of courts in this class of cases, wherein there always appears an element of ignorance on the part of the servant and superior knowledge, necessarily implied, on the part of the master directing the dangerous service resulting in injury. It is because of this superior knowledge as well as the superior position of the master that the servant, as a reasonable man, obeys the master and places rightful reliance on his superior position and superior knowledge. The trouble in respondent's case is that *he* had the superior knowledge and the *master,* represented by McRoberts, was comparatively ignorant. As things go in this world it is not allowable for an experienced and trusted servant to say that he relied on assurances of safety from an inexperienced master, pertaining to a matter and condition he knew more about than the master, and had created himself. Conceding that the servant is subordinate and that his duty is to obey, yet there is no slavery in the relation of master and servant, and an experienced and trusted servant can be in no danger of reprimand or discharge, under the facts before us in this case, in exercising his own reasonable discretion. The truth is, respondent practically did exercise his own discretion. For instance, on his own judgment he elected to disobey his master. Literally he was ordered to bore across the old hole, but he did not construe this command literally. To the contrary, he bored underneath the old hole, at a distance beneath and at an angle selected alone by himself. There is nothing in the evidence from which we can infer that he might not as well have bored his new hole above the old hole, or back of the bottom of the old hole, where he had reason to believe the danger lurked. Fairly interpreted, the orders of the master pertained only

to a method of getting ore and the servant was allowed to exercise and did exercise his own judgment where to bore his holes.

In what we have said we have referred to Mc-Roberts as the *alter ego* of the master. We have done so advisedly, because the evidence does not bear out the theory that Collins directed respondent in boring the new hole. It is true that Collins was sent for after the lead hole had been bored, and the last one had been started, for a foot or so, and respondent asked him what he thought of the ''run'' of the hole. Just what was in respondent's mind, we may not know; what he *said,* we do know; and what Collins answered can not fairly be construed into an assurance of safety. Collins had not directed respondent to bore at that place; he had not inspected the old hole; nor did respondent tell him directly of the result of his own inspection. He told that to McRoberts and he says Collins was close by. When Collins said it was all right and to go ahead, his response must be referred to the run or direction of the hole as an ore-breaker, and not as an assurance of safety.

The case at bar is not only distinguishable from cases where the master had superior knowledge of latent defects and dangers, but it is also distinguishable from that class of cases where a servant in a sudden emergency has received a peremptory order from his superior requiring immediate obedience without time for deliberation or the exercise of judgment.

In conclusion, we may be allowed to say there is an unexplained mystery about this explosion, and it will not do to take a large sum of money from one man's pocket and put it in another's on a mere guess. Who knows whether there would have been an explosion if the drill had passed across the old drill hole, *i. e.,* through it, in obedience to the letter of the command? Who knows there would *not* have been an explosion if respondent had bored a hole, as he set out to

do, parallel with the old hole, and, in its course, had struck a pocket, opening laterally into the old hole, and thereby caused an explosion by an emitted spark? Who can say there would have been an explosion if he had bored above the old drill hole, because it seems probable that by boring underneath, where the dynamite would naturally drop in a pocket, it was exploded by concussion or jar or a spark?

Furthermore, in our opinion, under the facts of this record, there is no testimony fairly tending to show that respondent was coerced or constrained into working on that section of the face of the drift, at that time. For aught appearing here, in a drift with a face of sixty feet, he could have worked elsewhere during the day, and could have exploded the old hole with a charge of dynamite at the close of the day, if he had elected to do so or asked to do so. But, trusting as under the facts in evidence we are constrained to hold, his own judgment, his own inspection, and boring his hole substantially in a spot to suit himself and at an angle to suit himself, this accident occurred and, sympathize with him as we may, his case, in our opinion, should not have been submitted to the jury — the form in which the case went to the jury thus becomes immaterial and questions pertaining to the other instructions need not be considered. The cause is reversed.

All concur.