CLAY H. TRENT, by next friend, Respondent, v. LECHTMAN PRINTING COMPANY, Appellant.

Kansas City Court of Appeals, February 21, 1910.

1. PRACTICE: Appellate: Demurrer to Evidence: Sufficiency of Evidence. Where evidence in support of a verdict is substantial and consistent with the physical facts, the appellate court will not say that the trial court erred in overruling defendant's demurrer to the evidence.

2. NEGLIGENCE: Master and Servant: Proximate Cause. Plaintiff was nineteen years and six months old. He was injured while working at a machine used for cutting and creasing cards. He had been employed at this work one day before the accident. In feeding cards into the machine he would put the card in with his right hand and remove it with his left. According to plaintiff's evidence the machine did not work as it should because of a defect described in the evidence, and plaintiff complained to his foreman several times during the day and was promised that the defect would be remedied, and plaintiff was directed to continue his work. While so doing his left hand was caught and injured. The jury were justified in finding that the defendant was negligent in requiring plaintiff to work at the machine in that condition, and that such negligence was the proximate cause of his injury.

3. ———: ———: Assumption of Risk. A servant does not assume a risk caused by the master's negligence.

4. ————: ————: Contributory Negligence: Imminent Danger. Before a court is justified in nonsuiting a plaintiff because of his contributory negligence, it must be shown indubitably that the danger incident to his employment was imminent and glaring, and of such a character that he could not reasonably expect to escape it by the exercise of due care; and it must also be shown that the plaintiff had, or was in a position to have, the same knowledge of its nature and extent as that possessed by the defendant.

5. PRACTICE: Misconduct of Counsel: Injecting False Issue: Defendant's Liability Covered by Indemnity Insurance. In an action for personal injuries where counsel for plaintiff for the purpose of injecting a false issue into the minds of the jury impresses them with the conviction that defendant's liability is covered by indemnity insurance and that defendant is trying to keep the fact out of the case, the trial court cannot cure such misconduct by striking out the evidence on that issue, but should on proper motion, discharge the jury.

Appeal from Jackson Circuit Court.—*Hon. E. E. Porterfield,* Judge.

REVERSED AND REMANDED.

*Battle McCardle* and *Harkless & Histed* for appellant.

(1) The demurrer to the plaintiff's evidence should have been sustained because there was no evidence upon which a jury was entitled to pass. Epperson v. Cable Co., 155 Mo. 346; Showalter v. Fairbanks, Morse & Co., 88 Wis. 376; Whaley v. Coleman, 113 Mo. App. 598; Knorpp v. Wagner, 195 Mo. 637; Myers v. Glass Co., 129 Mo. App. 557; Pulley v. Oil Co., 136 Mo. App. 172, 116 S. W. 430; Goza v. Car and Foundry Co., 142 Mich. 340, 105 N. W. 859; Rohrabacher v. Woodward, 124 Mich. 124; Mach. Co. v. Liter (Ky.), 66 S. W. 761; Oil Co. v. Shaw, 27 Tex. Civ. App. 65, 65 S. W. 693; Spencer v. Worthington, 60 N. Y. Sup. 873, Appel. Div.; Musser-Sauntry Co. v. Brown, 126 Fed. 141; Smith v. Box Co., 195 Mo. 715; George v. Mfg. Co., 159 Mo. 333; Doerr v. Brewing Assn., 176 Mo. 547; Fugler v.

Booth, 117 Mo. 491; Nugent v. Milling Co., 131 Mo. 241; Mfg. Co. v. Wendt, 116 Ill. App. 375; Marcan v. Packing Co., 106 Fed. 645; Roy v. Hodge, 74 N. H. 190; Cohen v. Hamblin and Russell Co., 186 Mass. 544; Gardiner v. Lumber Co., 101 N. W. 700, 123 Wis. 338; Stuart v. Railroad, 40 N. E. 180, 163 Mass. 391; Chmiel v. Thorndike Co., 65 N. E. 47, 182 Mass. 112; Manden v. Johnson, 89 Ill. App. 100; Genduhofen v. Ernsting, 23 Ind. App. 188. (2) Instruction No. 1, for plaintiff was bad. Burkhart v. Rope Co., 217 Mo. 466; Knorpp v. Wagner, 195 Mo. 637; Glasscock v. Dry Goods Co., 106 Mo. App. 657; Fugler v. Booth, 117 Mo. 491; Wojtylak v. Coal Co., 188 Mo. 260. (3) Instruction No. 2, for plaintiff was bad. Fugler v. Booth, 117 Mo. 491; Epperson v. Cable Co., 155 Mo. 340. (4) The court erred in refusing to discharge the jury at the request of defendant, because of improper questions asked witness concerning the interest of an insurance company in the case. Gore v. Brockman, 138 Mo. App. 231, 119 S. W. 1082; Volkman v. Brosman, 129 Ill. App. 182; Marigold v. Traction Co., 80 App. Div. (N. Y.) 381; Herrin v. Daly, 80 Miss. 340, 31 So. 790; Iverson v. McDonnell, 36 Wash. 73, 78 Pac. 202; Mfg. Co. v. Pruett, 110 Ga. 577, 36 S. E. 59; Sawyer v. Shoe Co., 90 Me. 369; Wagon Co. v. Boling (Ky.), 107 S. W. 264; G. A. Fuller Co. v. Darragh, 101 Ill. App. 664; Eckhart v. Schafer, 101 Ill. App. 500; Casselmon v. Dunfee, 172 N. Y. 507; McCarthy v. Coal Co., 83 N. E. 957, 232 Ill. 473; Hollis v. Glass Co., 69 Atl. 55, 220 Pa. 49; Brewing Co. v. Voeth (Tex. Civ. App.), 84 S. W. 1100.

*Reed, Atwood, Yates, Mastin & Harvey* and *D. E. Bird* for respondent.

(1) A servant is not guilty of negligence as a matter of law unless the risk is glaring and obvious. Tsouloufas v. National, etc., Co., 120 S. W. 1188; Burkhead v. Rope Co., 217 Mo. 480; Monahan v. Coal Co.,

58 Mo. App. 73; Buckner v. Stock Yards Co., 120 S. W. 769; Conroy v. Iron Works, 62 Mo. 39; Weldon v. Railroad, 93 Mo. App. 674; Campbell v. Railroad, 175 Mo. 175; Butz v. Construction Co., 199 Mo. 287; Huhn v. Railroad, 92 Mo. 440; 1 Labatt, Master and Servant, sec. 395. (2) An inexperienced servant may rely on the assurance of safety given by the master. Rowland v. Railroad Co., 20 Mo. App. 467; McGowan v. Railroad, 61 Mo. 532; Adolff v. Columbia, etc., Co., 100 Mo. App. 208. (3) It is proper to show defendant's liability is covered by insurance. Bard v. Bonsfield, 68 N. W. 45 (Minn.); Day v. Doneho, 41 Atl. 434 (N. J.) See, also Myer v. Mfg. Co., 67 Mo. App. 391.

JOHNSON, J.—Action by a servant against his master to recover damages for personal injuries alleged to have been caused by the negligence of the master. Verdict and judgment were for plaintiff in the sum of $7,000, and the cause is here on the appeal of defendant.

The injury occurred in Kansas City, May 4, 1906, and resulted in the loss to plaintiff of his left hand which was so badly mashed in a press operated in defendant's printing establishment that amputation at the wrist became necessary. Plaintiff, at the time was a minor, nineteen years and six months old. He was reared on a farm, had come to the city September, 1904, to seek his fortune, had been employed in various capacities and, about three weeks before his injury, had obtained employment from defendant. He was inexperienced in the printing business and did roustabout work for awhile, but the day before he was hurt, defendant set him to feeding a press employed in cutting and creasing sheets of cardboard for use in making paper boxes. The foreman of the room explained the work to plaintiff and instructed him in the use of the machine which was of the following description:

The back of the press was upright, immovable, and

made to receive and keep in place a die which was 21x31 inches in superficial dimensions and made to hold thin metal strips set edgewise. Some of these strips, called knives, had sharp edges to cut through the cardboard, others had dull edges to crease it. A movable platen, or jaw, received the cardboard on its inner surface and closed it on the die where it received the necessary cuts and creases. The press was run by electric power and in operation the jaw made twenty-four movements per minute. As the jaw brought back a treated sheet, it was the duty of the operator to remove that sheet with his left hand and to put in a fresh one with his right hand. Necessarily the hand had to be inserted a few inches below the outer edge of the jaw and if not withdrawn in time, would be caught by the jaw, which was heavy and powerful, and crushed against the stationary die. When in good order the movement of the jaw allowed sufficient time for the hands of the operator to perform their functions in safety. Devices called blocks or guides held the cardboard on the face of the platen so that it would not move in being carried to and from the die. To prevent the cardboard from sticking, it was necessary to oil the face of the platen occasionally. This was done by the operator who rubbed the surface with an oiled rag and it was an imperative rule of the office that the oiling should not be done while the press was in motion. Another device called an "impression" fixed the place at which the jaw would stop in its forward movement. When the impression was "on" the jaw brought the cardboard against the die with enough pressure to cause it to be cut and creased, but when the impression was "off" the jaw stopped when its face was a fraction of an inch from the face of the die. Another rule of the office required the impression to be thrown "off" by the operator before he undertook to oil the face of the platen. Projecting forward two inches or so from the face of the die were four small coiled springs and between the knives and

creases were inserted a large number of small squares of cork. The surface of these squares was slightly raised above the edges of the knives and it appears that the springs and corks acted as a cushion to protect the knives from receiving the pressure from the face of the platen and also served to push the cardboard back and thereby to prevent it sticking to the die. The evidence of plaintiff tends to show that the springs and corks had been used so much they were weakened and so deficient in resiliency that they allowed the cardboard, in many instances, to become displaced and spoiled and that in removing the spoiled ones, plaintiff was compelled to insert his left hand deeper into the machine than was necessary when it was in proper order. On one such occasion, he failed to withdraw his hand in time, and it was caught by the jaw and mashed against the die.

The petition alleges "that by reason of the failure of the said cork and springs around said knives of said wall or back and by reason of the failure of the pins or guides on said lid or jaw to hold the paper in the usual and ordinary way, this plaintiff was compelled to reach farther into said machine and to expose his hands to being caught and injured by the action of the knives in the operation of this machine; and that by reason of the defective condition as aforesaid, and while attempting to perform his duties in the usual and ordinary way, and without any fault or negligence on his part this plaintiff was injured . . . that when said machine failed to perform its duties in the usual and ordinary way, he made complaint to defendant's superintendent in charge, E. W. Fehrenkamp, and that said superintendent, E. W. Fehrenkamp, assured this plaintiff that said machine was in proper condition, and, that no danger would befall this plaintiff in performance of his duties as aforesaid . . . that defendant negligently and carelessly allowed said machine to become and remain out of repair; that de-

fendant negligently and carelessly failed and refused and neglected to warn this plaintiff of any danger; that defendant, by their superintendent, E. W. Fehrenkamp, instructed and compelled this plaintiff over his said objections and protests, to work at and with said machine —thereby causing the injuries complained of in this petition. . . . that the defendant knew of the defects in said machinery, or by the exercise of care and caution could have known of said defects in time to have prevented the accident to this plaintiff."

The account of the injury given by plaintiff in his testimony is as follows: "Well, it was the evening of the third, probably fifteen or twenty minutes before quitting time at 5:30, as I remember, that I was put on this job of cutting these pepper and spice boxes, and I noticed the machine was not working just right then, but I had no opportunity to speak to Mr. Fehrenkamp because he was busy and it was so near morning when I began work at eight o'clock I fed a few cards to see if it was still working that way and it was, and it seemed to me it was out of order, and I went to Mr. Fehrenkamp and spoke to him, and he says, 'I am busy, I will be back;' and I went along again. He came over and said, 'Put two pieces of cork here,' and I put the cork in and it didn't work any better than before and I stopped the press and went over again and says, 'I can't do anything with that press, those corks don't make it do any better.' He came over and looked at it again, and I believe he put in a piece of cork again and he cleaned off the dies—some paraffine off of the dies, and he says, 'wipe this paraffine off and oil the lower plate so that it won't stick so much;' and I done that. I went to him right away before noon and spoke to him and he says, 'I am too busy, wait until afternoon and I will have Bart Pierce, the die-maker, fix it.' And about one o-clock I went to him and says, 'can't you have Bart fix that, I can't do anything, it cuts all the cards up and I can't do anything.' He says, 'Bart is

busy now. Run it awhile and do the best you can.' I went back the second time and he says, 'Bart is still busy making a die.' And I went to him a third time shortly before two o'clock, and he came over and stopped the press and looked over it and says, 'That press is all right, the die is a little rough, but as soon as it gets smoothed down the cards will run better.' He says, 'the paper is new and it will naturally stick, but keep it well oiled and it will soon get all right.' . . . He came over and looked at the press and said it was all right, go ahead; and I went ahead and worked at it and it was not fifteen or twenty minutes that the press caught my hand when I was reaching for a card that stuck in the same manner."

This version is contradicted in vital particulars by the evidence of defendant. Witnesses deny that there was any defect in the cork squares and springs or in any other part of the machine, and state that sometime before the injury the foreman caught plaintiff oiling the platen while the press was running, and sharply reproved him; that after the injury no cardboard was in the machine; that the impression was "off" and that the oiling rag was found in the machine considerably cut up by the knives and that a subsequent examination of the rag by a microscopist disclosed the presence of human blood and particles of flesh. The inference from these facts is that plaintiff, when injured, was oiling the face of the platen while the machine was in motion and in doing so was disobeying one of his master's positive orders.

In the argument of the demurrer to the evidence, counsel for defendant urge that in his own testimony, plaintiff convicts himself of contributory negligence in law; that the machine with the defect as he depicts it was imminently dangerous and that the "danger was obvious and known to plaintiff who voluntarily chose to face it instead of quitting the employment." Bearing on this issue is the following testimony of plaintiff:

"When he (the foreman) told me it was all right I relied on him. . . . All I could see was the matter was the sticking of the cards, but I didn't know what caused that . . . I thought it was safe because he told me it was. . . . Well, to the best of my recollection, I told him it was catching cards and was liable to get my hand next. . . . The machine looked like it was dangerous . . . he told me to work, work at the press and I was under him and if I did not do the work he would have discharged me. . . . I was needing a job rather strong to quit it. . . . I thought there might be some danger to me. . . . Q. And you did first think there was imminent danger when you first noticed that the cards began to double and catch, didn't you? A. Well, yes, sir. Q. What would imminent mean, if you know? A. Well, I think it means danger close or something like that."

We have been quoting from the cross-examination which was searching and severe. Fairly summed up, the testimony of plaintiff shows that he knew the sticking of the cards was due to some defect; that it increased the danger of his employment, but that the assurance of the foreman led him to believe he could work in safety by being careful; that he reposed confidence in the superior knowledge and judgment of the foreman and accepted as true his statement that "the die is a little rough but as soon as it gets smoothed down the cards will run better."

It may be true as defendant contends that the preponderance of the evidence is on the side of defendant, but the jury did not think so, and we are in no position to weigh the evidence. That of plaintiff is substantial and plausible. It is not inconsistent with the physical facts of the situation and in ruling on the demurrer to the evidence, we must give it full credence. The jury had the right to believe that the springs and cork pieces were worn and unresponsive; that their con-

dition caused the cards to stick and compelled plaintiff to thrust his hand deeper into the jaws of danger than would have been necessary but for the defect, and that the limit of but two seconds in which to make two movements of the hands in the opening and closing mouth made the defect a menace to his safety. On this hypothesis of fact, the jury were justified in the inference that the defect was the proximate cause of the injury (Tsoulufas v. Stamping Co., 139 Mo. App. 141), and that it was negligence of defendant to require plaintiff, a green hand, to work at a machine in that condition. Nor was the risk of injury caused by the defect one that should be classed among the risks assumed by plaintiff. It falls squarely within the rule that a servant does not assume a risk caused by the negligence of the master, but only those that are natural and incidental to the employment. [Curtis v. McNair, 173 Mo. 270.]

But defendant argues: "Plaintiff was fully aware of the condition of the press, of the way it was working, and of the danger to himself. In the absence of alleged assurance, his case could not have been submitted to the jury. The alleged assurance neither increased nor diminished his knowledge of the condition of the press, or the danger. He knew the foreman had done nothing to alter the condition of which he had complained seven times and with such knowledge, and with the knowledge that the condition was continually growing worse, he elected to keep at work."

From this view of the case, defendant draws the conclusion that plaintiff's own fault must preclude him from any cause of action based on the negligence of defendant. Many authorities are referred to as supporting this position, among them: Epperson v. Telegraph Co., 155 Mo. 346; Showalter v. Fairbanks, 88 Wis. 376; Knorpp v. Wagner, 195 Mo. 637; Myers v. Glass Co., 129 Mo. App. 557; Goza v. Car and Foundry Co., 142 Mich. 340; Rohrabacher v. Woodward, 124

Mich. 124; Machine Co. v. Liter, 66 S. W. 761; Smith v.
Forrester-Nace Box Co., 193 Mo. 715; Doerr v. Brewing
Co., 176 Mo. 541. No good purpose would be served by
special reference to these cases. The rules followed
in them were pertinent to the particular state of facts
to which they were applied. But, often, what appears
at first as but a slight distinction in the facts of two
cases, on closer analysis is found to be a distinction of
first importance, and we find in the facts of the present
case no good reason for drawing a close analogy be-
tween them and the cases relied on by defendant.

We concede that however inexperienced he may
have been, plaintiff must be held to have known
that he would be injured if he allowed his hand
to be caught by the closing jaw, and that the
deeper he thrust his hand into the machine, the greater
would be his danger. His testimony shows he was
aware that danger lurked in his course, but we do not
think the evidence indubitably discloses either that
the danger was imminent and glaring, or that plaintiff
had—or was in position to have—the same knowledge
of its nature and extent as that possessed by the fore-
man. The inference is reasonable that an ordinarily
careful and prudent person in the situation of plain-
tiff would have thought, as he did, that the time allowed
by a movement of the jaw would suffice for the extrac-
tion of a spoiled card from the machine. Much stress
is laid on the admission of plaintiff that he knew the
danger was "imminent." But that admission must be
considered and weighed in the light of the context and
of all the facts and circumstances of the situation. In
the first place, the evidence, as we observed does not
show conclusively that the danger was imminent, with-
in the technical definition of the word. Plaintiff said
he thought *imminent* meant close or "something like
that," and certainly the danger of his employment, even
under normal conditions would be close and always
present. The moving jaw was as inexorable and relent-

less as fate; the operator had to move his hands with
the regularity of clock-work to keep them out of the
way. In that sense, the danger was close to him, but it
was not close in the sense that with the machine in
good order he was in any danger of injury if he exercis-
ed reasonable care. The jaw moved with regularity and
precision. It gave the operator so much time—enough
time for him to do his work in safety and when the
machine was in good order danger was not imminent in
the sense of being certain to overtake him, and, though
impaired with the defect under consideration, we think
the inference was reasonable that the machine could be
operated in safety with the observance of greater care
than ordinarily would be required.

The facts, as we view them, do not accuse plaintiff
of negligence in law, especially when his inexperience
and inequality of position as compared with that of the
foreman are taken into account as they should be. He
was but a boy, knew nothing about the machine, and
what could be more natural than for him to believe the
assurance of one whose experience and mastership au-
thorized him to speak that the machine was safe and the
defect but temporary. The learned trial judge was
right in treating the issue of contributory negligence
as one of fact for the jury to determine and was right
in overruling the demurrer to the evidence.

Many objections are urged against the rulings of
the court on the instructions. The principal points
have been answered sufficiently in what we have said.
The others, on examination, are found to be without
merit. The instructions are free from prejudicial error
and fairly presented the issues to the jury. It is argued
the verdict "is grossly contrary to the weight of the
evidence," and is opposed to the physical facts of the
situation, but we have already disposed of that point
adversely to the contention of defendant.

Finally, it is contended that prejudicial error was
committed by the court in allowing plaintiff's counsel

to inject into the evidence a false issue which it is claimed was highly injurious to defendant.

On cross-examination, counsel for plaintiff thus interrogated one of defendant's witnesses with reference to the speedy appearance on the scene of the injury of one of the attorneys of record:

"Q. Wasn't it the same day? A. I don't remember just when it was.

"Q. Don't you remember that it was the same day that Clay was hurt? A. No, sir; I can't say that I do.

"Q. Mr. McCardle came down and you had a grand round-up and you talked over this whole matter and you explained to him about the die? A. No, sir; I don't remember just what day it was.

"Q. Do you know how Mr. McCardle happened to come down there? A. I do not.

"Q. Did anybody send for him? A. I don't know.

"Q. Do you know who sent for him? A. No, sir.

"Q. Do you know whether Mr. Lechtman called him to come down or not? A. I do not know.

"Q. When he came down didn't he say that he had been sent there by the insurance company to investigate the matter?

"Mr. Harkless: Defendant desires to object to this question as wholly incompetent, immaterial and for the further reason that it intimates and seeks to have it understood that some insurance company was interested in the matter. For the further reason that it tends, and it is offered for the evident purpose that it may have an improper influence in the case; that it is wholly immaterial who sent him there besides. And the defendant now asks the court to tell the jury that the remark and question is improper in character and intimation, and to discharge the jury from the further consideration of the case.

"The Court: The objection will be sustained and

141 App.—29

the jury instructed not to consider it in the making up of their verdict.

"To which ruling and action of the court in failing to discharge the jury, the defendant then and there at the time duly excepted and still excepts.

"Mr. Yates: The purpose of Mr. McCardle in going there; the fact that he met with, talked with all these people so soon after this boy was hurt and, as will be further shown in the evidence, before any claim or intimation of any claim had been made upon this company on account of this injury, are all circumstances that ought to go to the jury. If he had motives in going there, without intimating what it was, the jury have a right to know.

"Mr. Harkless: I desire now to except to the statement of counsel just made in the presence of the jury, as still adding to the improper influence which he sought to draw from his question, and is an effort, after the court has ruled against him, to still persist in insisting upon the improper conduct, and we ask the court now to discharge the jury from any further consideration of the case.

"The Court: The motion to discharge the jury will be refused.

"To which action and ruling of the court the defendant then and there at the time duly excepted and still excepts.

"Mr. Yates: I understood the court had already ruled on the question. What I said I simply said in answer to the remarks of Mr. Harkless.

"Mr. Harkless: We have no objection to what was said down there.

"The Court: I think what he said and did is all proper.

"Mr. Yates: I don't know any way to get at it only on cross-examination, necessarily. They didn't advise me. The only way I can get at it is by cross-examination. Necessarily Mr. McCardle didn't advise us

he was going down there, and the only way we have of finding out what was said or done there is by cross-examining the witness—those who were present, which we claim we have an undoubted right to do.

"Mr. Harkless: I desire to except to the gentleman's statement as an inference, again, that Mr. McCardle was there for some improper purpose, and for some purpose not on behalf of the defendant in this case, and is still continuing and justifying himself against the ruling of the court repeatedly, and ask again that the jury may be discharged from the further consideration of the case.

"Mr. Yates: I only know, by giving play to my imagination, what he was there for, but I have a right to find out.

"Mr. Harkless: I desire to except to the remark of counsel, just made, as indicating that he was there for some improper purpose, and for some purpose other than that of looking after the interests of the defendant in this case, and as still continuing to follow up the improper conduct, and ask the court again to discharge the jury from the further consideration of this case.

"The Court: The remarks of Mr. Yates are withdrawn from the jury and the jury are instructed not to consider them.

"To which ruling and action of the court, in failing to discharge the jury, the defendant then and there at the time duly excepted and still excepts."

"In Gore v. Brockman, 138 Mo. App. 231, the defendant, a doctor, was asked in a malpractice suit if he did not have 'doctors' protective insurance.'" Speaking through ELLISON, J., we said: "The question was improper and highly prejudicial. The issue on trial was negligent treatment of plaintiff by defendant as her physician, and indemnity insurance would not aid in determining that question; but more than that, its tendency and effect were to withdraw the real defendant from the consideration of the jury and to substitute

for him an insurance company. A litigant has a right to his own personality, and the opposing party has no right to have the consideration of his claim influenced or measured by any other standard, so far as individuality is concerned, than that afforded by the party of whom he complains. He cannot ask unliquidated damages of a good man who may have injured him and then substitute a bad man at the trial. The subject has been before the courts, and similar questions have been condemned."

We take cognizance of the universal belief among lawyers of the highly injurious effect on the defense in a personal injury suit of the intimation that the defendant is protected by insurance. It is obvious counsel for plaintiff adroitly managed to impress the jury with the conviction that defendant was insured and was endeavoring to keep the fact out of the case. We cannot regard what he did as otherwise than a bold attempt, successfully executed, to inject a false issue into the minds of the jury. It is just as obvious that the action of the court, in suffering counsel to poison the minds of the jury and then in telling the jury that his remarks were withdrawn from their consideration, cannot be regarded as sending a complete antidote after the poison. No doubt counsel counted on having defendant's objections to his questions and remarks sustained and fully appreciated the impotency of such rulings. We hold the court erred in not sustaining the motion of defendant to discharge the jury. There was no other adequate remedy for such virulent poison.

For this error, the judgment is reversed and the cause remanded. All concur.