MILDRED BUEHLER v. FESTUS MERCANTILE COMPANY, a Corporation, Appellant.—119 S. W. (2d) 961.

Court en Banc, September 28, 1938.

*Wm. H. Allen* for appellant.

144

*Eagleton, Waechter, Yost, Elam & Clark, Frank E. Atwood, Walter Wehrle* and *Ennis & Ennis* for respondent.

ELLISON, J.—This case was written in Division Two by COOLEY, C., and transferred to the court en banc on the court's own motion. The divisional opinion affirmed the judgment for respondent on condition that she remit $5000 from the verdict of $30,000. We adhere to that opinion on each assignment discussed (save as to the

*remittitur*) except the one which holds certain improper argument of respondent's counsel was not reversible error. Up to that point we have adopted the opinion bodily with very slight changes and without quotation marks. Before the court en banc the appellant has raised a new point with respect to respondent's Instruction No. 2. We discuss that assignment also.

Action for damages for personal injuries. Verdict and judgment for plaintiff for $30,000 and defendant appeals. Plaintiff was injured in a collision between a Ford coupe in which she was riding as a guest and an automobile truck being operated by defendant corporation's employee. The case was submitted to the jury on two specifications of negligence, one, excessive speed of the truck,—primary negligence—and the other negligence under the humanitarian doctrine. Appellant challenges the sufficiency of the evidence, claiming that plaintiff was conclusively guilty of contributory negligence, barring recovery. It is also asserted that the verdict is excessive, and that the judgment should be reversed because of alleged prejudicial remarks of plaintiff's counsel in argument to the jury. There is no question as to defendant's liability for the truck driver's negligence, if any. The contention as to sufficiency of the evidence requires a somewhat detailed statement of the facts.

The collision occurred in the daytime, about two o'clock P. M., December 22, 1932, in the intersection of two main thoroughfares in the city of Festus, Missouri, viz., Second Street, an east and west street, and Mill Street, a north and south street. Approaching the intersection from the east Second Street is somewhat upgrade, the steepness of the grade increasing west of Mill Street.

Approaching said intersection on Mill Street from the north the grade is downward. There is what is referred to as a "jog" in Second Street at this intersection, the south curb line of Second Street west of Mill Street being nearly on a line with the north curb line of Second Street east of Mill Street, and also Second Street west of Mill Street is a little wider than it is east of Mill Street, resulting that in going west in Second Street a person crossing the intersection has to "angle" slightly to the north in order to enter his right side of Second Street west of Mill Street. The roadway portion of Second Street east of Mill Street is about twenty-two feet wide and the roadway of Mill Street is about twenty-four feet wide.

On the occasion in question plaintiff was riding, as a guest, in a one seated 1924 Model T Ford coupe, with a Mrs. Ursula Colin, who was driving. Mrs. Colin owned and had driven said car for about six years. Plaintiff was seated at Mrs. Colin's right. They approached the intersection from the east, in Second Street, intending to cross and continue westward. According to evidence adduced on behalf of plaintiff, which, for the purpose of determining a demurrer

to the evidence must be taken as true, they had reached the west side of the intersection—the west curb line of Mill Street—when defendant's truck crashed into the right side of the Ford coupe, at about the right door, forcing it—"skidding it"—southward to and against a telephone pole on Mill Street south of the southwest corner of the intersection, knocking the left door off the coupe, injuring plaintiff and throwing Mrs. Colin out of the coupe on the left hand side.

As to what occurred just prior to the collision plaintiff's testimony is rather meager. She said that she was sitting at the right of Mrs. Colin, who was driving, and that Mrs. Colin was driving very slowly as they approached the Mill Street intersection; that she (plaintiff) did not see or hear the truck before the collision; and that the Ford coupe was more than half way across the intersection when it was struck by the truck. She was not asked and did not testify whether or not she looked for vehicles on Mill Street approaching from the north.

Mrs. Colin testified, in substance, that when about ten feet east of the intersection she had reduced her speed to three or four miles an hour; that she then put her car into low gear; that when she reached the east line of Mill Street she reduced her speed "three or four miles an hour;" (perhaps she meant reduced it *to* three or four miles an hour—her testimony is not exactly clear on this point); that as she reached the east line of the intersection she looked north and south on Mill Street for traffic and saw none, except defendant's truck, which she said was then about 225 feet north of the intersection; that she was unable to judge its speed, but feeling, on account of the distance, that she had plenty of time to cross safely, she increased her speed, so as to get across "after she saw the intersection was clear;" that she did not, however, shift gears, continuing across the intersection in low gear; that when she had traversed practically the entire width of the intersection and the front end of her car was some three feet west of the west line (curb line?) of Mill Street it was struck by the truck, and "knocked" or "skidded" southward about twenty feet to and against the telephone pole; that at the moment of collision she was "in about five feet" of being across the intersection. (Other evidence on behalf of plaintiff indicates, because of the estimated length of the coupe, that if the front end of her car was three feet beyond the west curb line of Mill Street she may have lacked seven or eight feet of being entirely across.) She further testified that as she crossed the intersection she was traveling at not to exceed ten miles an hour. Her testimony on this point is not entirely clear but we think a fair construction of it is that she did not *exceed* ten miles an hour and had attained about that speed at the moment of collision, after having almost

stopped at the east side of the intersection and then gradually increased her speed, still in low gear, as she crossed.

There was testimony of other witnesses for plaintiff that as the Ford coupe reached the east side of the intersection it was going very slowly, not over about two to four miles an hour, one witness saying that it came practically to a stop at that point, and that it then proceeded across with accelerating speed and was going perhaps as much as, but not more than, ten miles an hour at the moment of the collision; also that when Mrs. Colin nearly stopped at the east side of the intersection and then put her car in low and started across, the truck was from 225 to 275 feet north of the intersection. Evidence on behalf of plaintiff tended to show that the truck approached the intersection at a speed of forty-five to fifty miles per hour and did not slacken its speed or swerve before the collision. Tire marks on the pavement, according to witnesses for defendant, indicated that the brakes had been put on, causing the wheels to slide, some twenty-five or thirty feet north of where the cars came to rest. Defendant's witnesses saw no marks on the pavement to indicate that the Ford had been pushed or skidded southward. For plaintiff two eyewitnesses, other than Mrs. Colin, corroborated the latter as to the Ford having been knocked or skidded southward from the point of collision to and against the telephone pole. The pole, somewhat rotted at the bottom, was broken off near the ground by the force of the impact of the Ford car against it. Plaintiff's evidence was that the truck driver gave no signal or warning of his approach prior to the collision.

Extending south from the southwest corner of the intersection, on the west side of Mill Street, along the west sidewalk line, there was a concrete retaining wall. Both cars stopped with their front ends practically against that wall, the Ford then pointing somewhat northwest and the truck somewhat southwest. The truck, possibly also the Ford, hit that wall before stopping. A portion of the wall was broken off. The sidewalk there was about four feet wide and the telephone pole was at its east edge.

The truck driver testified that as he was proceeding southward on Mill Street toward the intersection he was driving at about twenty miles an hour; that when he was almost at the intersection he looked to his right—west, up Second Street—then to his left, when for the first time he saw the Ford (which must have been then practically in front of him) and "we just met there and I cut my wheels (to the right) and put on my brakes . . . and hit the wall;" that he could not tell where the Ford was before the collision; that his truck moved some distance, over twenty feet, between the time he applied his brakes and the time it hit the wall; that the two vehicles hit the wall and stopped at approximately the same time;

that he did not believe his truck hit the Ford before both got over to the wall; and that, considering his speed and the existing conditions, he could have stopped his truck within thirty to forty feet. Other facts will be stated in connection with points to which they apply.

Appellant's first contention is that plaintiff was not entitled to go to the jury on the charge of excessive speed or any charge of primary negligence because she was conclusively shown to have been guilty of contributory negligence as a matter of law in that she failed to look for cars approaching on Mill Street as the car in which she was riding entered the intersection but "blindly permitted the driver to negligently drive her into obvious danger." Appellant contends that "this was negligence proximately contributing to her injury." To this we cannot assent. Plaintiff was not the driver of the car but only an occupant and her conduct with respect to the exercise of care must be judged accordingly. The law on this subject has been well stated in Boland v. St. Louis-San Francisco Ry. Co. (Mo.), 284 S. W. 141, 144 (4-6) as follows:

"We fully subscribe to the doctrine that the occupant of a vehicle cannot abandon the exercise of his own faculties and intrust his safety absolutely to the driver, regardless of the imminence of danger or the visible lack of ordinary caution on the part of the driver to avoid harm. [Fechley v. Traction Co., 119 Mo. App. 358, 96 S. W. 421.] Yet it is a matter of common knowledge that under ordinary circumstances such occupants do largely rely upon the driver, who has the exclusive control and management of the vehicle, exercising the required degree of care, and for that reason courts are not justified in adopting a hard and fast rule that they are guilty of negligence in doing so. Every case must depend upon its own particular facts."

The above holding in the Boland case has been approved and followed in subsequent cases. In Smith v. St. L.-S. F. Ry. Co., 321 Mo. 105, 121, 9 S. W. (2d) 939, 946, it is said:

"It is now well settled in this State that the negligence of the driver of an automobile cannot be imputed to another occupant of the automobile, unless the relation between them was such that the driver's acts or omissions were under the law the acts or omissions of such other occupant of the automobile, or unless such other occupant of the automobile expressly sanctioned what the driver did or failed to do."

In the same case, 321 Mo. l. c. 122, 9 S. W. (2d) l. c. 946, we read:

"While the law requires a guest in an automobile to exercise ordinary care and prudence for his own safety, and does not permit him to intrust his safety absolutely to the driver, regardless of impending danger or apparent lack of ordinary caution on the part of the driver, it does not require him to use the same vigilance as is

required of the driver,. nor put him under the same obligation to look for danger as is the driver.''

Appellant recognized at the trial that the driver's negligence, if any, could not be imputed to plaintiff, for it asked and was given an instruction telling the jury that the driver's negligence, if any, could not be imputed to plaintiff but that if the jury found that the collision ''was the result solely of negligence on the part of Mrs. Colin'' the verdict should be for the defendant. Defendant asked no instruction submitting contributory negligence on the part of plaintiff.

For further discussion of the principle announced in the above quotation from the Boland case see Thompson v. St. L.-S. F. Ry. Co., 334 Mo. 958, 974 et seq.; 69 S. W. (2d) 936, 945 et seq.

In the instant case it does not affimatively appear that plaintiff did not look north up Mill Street before the Ford car in which she was riding entered the intersection. She was not asked and did not testify as to that. For aught that affirmatively appears she may have looked to her right, but not far enough. It must be borne in mind that the truck was then 225 to 275 feet north of the intersection. Appellant argues that her testimony that she did not see the truck till about the moment of collision shows conclusively that she had not looked. Be that as it may, if she had looked and had seen the truck she could have informed the driver, Mrs. Colin, of nothing the latter did not know. Mrs. Colin did look, as, for aught that appears to the contrary, the plaintiff may have observed, and did see the truck, but it was so far away she thought, not knowing its speed, that she had ample time to cross. Moreover, it may be observed that under the facts shown by plaintiff's evidence, Mrs. Colin clearly was entitled to the right of way and, not knowing the speed of the truck, may reasonably have assumed that the driver thereof would comport himself as the law and his duty required and as a reasonably prudent driver might be expected to do. Considering the circumstances and the distance of the truck from the intersection when Mrs. Colin reached it and started across we cannot say that even she was conclusively guilty of contributory negligence as a matter of law in starting across the intersection as she did.

Furthermore, insofar as concerns the question of plaintiff's alleged negligence in failing to look for cars coming from the north and failing to see the truck and to warn Mrs. Colin of its approach, such failure of plaintiff could have had no causal connection with the collision and could not have been the proximate cause of plaintiff's injuries because Mrs. Colin had herself looked, had seen the truck and knew it was approaching. Information or warning of that fact from plaintiff could have told her nothing she did not already

know. See on this proposition Rosenstein v. Lewis Automobile Co. (Mo. App.), 34 S. W. (2d) 1023, 1026 (4).

While, as we have said, defendant did not ask any instruction as to plaintiff's contributory negligence, plaintiff's instructions required the jury to find, as to primary negligence, that she was exercising ordinary care. Appellant does not challenge the form or wording of any of the instructions, its contention being only that plaintiff was shown to have been contributorily negligent as matter of law. We rule this contention against appellant.

On the theory of negligence under the humanitarian doctrine an instruction for plaintiff authorized a finding for her if the jury found that the truck driver saw or should have seen the Ford coupe, with plaintiff therein, crossing the intersection in time thereafter to have slackened his speed or swerved the truck and thus avoided the collision. The correctness of the instruction is not challenged if the case was submissible on the theory of negligence under the humanitarian doctrine. Appellant's contention is that plaintiff did not make a submissible case on that theory. It argues that plaintiff was not in a position of imminent peril as the Ford coupe approached and nearly stopped at the east side of the intersection nor until the driver thereof accelerated her speed and started across and that after she did so there was no time for the truck driver to slacken speed or swerve so as to avoid the collision.

Appellant's theory seems to be that both vehicles reached the intersection at practically the same time and it says that both hit the retaining wall at approximately the same moment. It is argued that the physical facts shown and certain photographs introduced demonstrate that the Ford was not struck in the intersection and forced southward as plaintiff and her witnesses testified and that the collision could not have occurred as she claimed it did. We have examined said photographs and fail to find in them substantiation of appellant's said claim or inconsistency with plaintiff's oral evidence. The argument that both vehicles reached the intersection at approximately the same time ignores or assumes as not possibly true, because of physical facts shown by the photographs, the testimony of plaintiff's witnesses that when Mrs. Colin accelerated her speed and started across the intersection the truck was 225 to 275 feet north of the intersection. Her intention to proceed across must have been apparent to the truck driver if he was looking, as it was his duty to do.

Conceding to appellant, for the purpose of the case, that the plaintiff was not in imminent peril until the Ford coupe, after having nearly stopped at the east side of the intersection, accelerated its speed and started across and that, therefore, defendant's driver cannot be charged with negligence for failing to discover plaintiff's

peril and to act until the Ford had so started across, the fact remains that after that the truck driver, according to plaintiff's evidence, had time and opportunity to avert the collision. When Mrs. Colin started across the intersection, with accelerating speed and with the obvious intention of proceeding across, the truck, as we have said, was more than 200 feet away.

Appellant argues there is no evidence showing in what distance the truck's speed could have been slackened or its course swerved so as to have avoided striking the Ford. The truck driver testified that he could have *stopped* in thirty to forty feet. Even absent that testimony we cannot be blind to the indubitable fact that in a distance of 225 feet or more the speed of the truck, whether going twenty miles an hour, as the truck driver testified, or forty-five to fifty miles an hour, as plaintiff's evidence showed, could have been appreciably slackened or the truck swerved slightly to its left—there being no opposing traffic—so as to have avoided the collision. According to plaintiff's evidence the Ford coupe, at the moment of collision, was traveling at about ten miles an hour and lacked but a few feet of clearing the west curb line of Mill Street. A very slight slackening of the speed of the truck or a slight swerving of its course to its left would have averted the collision. Without attempting to state any hard and fast rule, applicable generally, as to how much the speed of the truck could have been reduced after plaintiff's peril became or should have become apparent to the truck driver, we have no hesitation in saying that, obviously, it could have been reduced sufficiently in the distance mentioned, or the course of the truck swerved, enough to have enabled the Ford to clear. [See Spoeneman v. Uhri, 332 Mo. 821, 60 S. W. (2d) 9.] This point must be and is ruled against appellant.

We leave now the opinion written by Cooley, C., and come to the assignment that the judgment should be reversed because of improper argument by respondent's counsel. At the beginning of the trial, out of the hearing and presence of the jury, the following occurred:

"Mr. Eagleton: I desire to ask counsel whether or not he represents the Aetna Casualty Company, and whether or not that insurance company has procured the attendance of witnesses here?

"Senator Gardner: I suppose I represent a Mr. Robinson, who seems to be the agent for the Aetna. I don't know if it is the Aetna Casualty or Aetna what. Mr. Eagleton: One of the Aetna Companies?

"Senator Gardner: It is one of them, and I issued subpoenas for my witnesses, or Mr. Terry did. They had nothing to do with getting the witnesses up here.

"Mr. Eagleton: I don't mean getting them in the court room,

but did they have anything to do with procuring them originally?

"Senator GARDNER: That was done down there."

Thereupon, during the *voir dire* examination of the jury, respondent's counsel asked them these questions and received these answers:

"Mr. EAGLETON: Is there any gentleman who has had any acquaintanceship with the Festus Mercantile Company, or its officers, or has done any business with it? Is there any gentleman on the panel who does business with or has any policy with the Aetna Casualty Insurance Company, which writes liability on automobiles and trucks?

"A JUROR: I had one until the first of the year, but I have another company now.

"Mr. EAGLETON: And while you were doing business with that company did you have any occasion to use the service of their attorneys or claim agents? A Juror: No, sir.

"Mr. EAGLETON: You don't know Mr. Robinson? A Juror: No, sir.

"Mr. EAGLETON: Any other gentleman who has a policy with the Aetna Casualty, or had business with them, either through which a policy was written or through having made a claim against that company at any time?"

The trial proceeded, the appellant using only three witnesses, all of whom lived in or near Festus where the casualty occurred. There is nothing in the record to show any of them had anything to do with appellant's insurer, except such contact as they may have had with the attorneys defending the case. After the evidence was in, and at the beginning (apparently) of his opening argument to the jury, Mr. Wehrle, of counsel for respondent, referred to the serious injuries sustained by the respondent and her happy situation theretofore, and then said (we show also the objections and the court's ruling):

"All we want in this case is justice, justice for this little woman. We don't want a small verdict in this case; we want a large verdict, gentlemen. This suit is for $50,000.00, and that is the sum of money that this woman is entitled to recover, if she is entitled to recover a dime. Don't worry about who we will collect it from. You give this woman a substantial verdict for the injuries she has sustained and leave it to the lawyers in this case to collect it for her—

"Senator GARDNER: Now, just a minute; that is highly incompetent in this case, an argument of this character. There is only one defendant in this case.

"Mr. WEHRLE: I never said anything about 'defendants.'

"Senator GARDNER: I think that argument is highly prejudicial, and I am going to ask that the jury be discharged.

"Mr. WEHRLE: Well, I will withdraw it, and apologize to the Senator and the Court and jury for making that argument.

"Senator GARDNER: That don't remedy the situation.

"The COURT: The Court will not discharge the jury. Mr. Wehrle has withdrawn the statement, and the Court will instruct the jury to disregard the statement." (Exceptions saved.)

It will be noticed respondent's counsel said $50,000 was the sum of money she was entitled to recover, and that the jury should not worry about *whom* she would collect *it* from; that they should give her a substantial verdict and leave it to the lawyers in the case to collect it for her. There was only one defendant, the Festus Mercantile Company, which conducted a grocery and dry goods store at Festus, and the plain inference was that it had $50,000 liability insurance, and that respondent's attorneys would collect the judgment from the insurance carrier, the Aetna Casualty Insurance Company, referred to in the *voir dire* examination as a company "which writes liability insurance on automobiles and trucks." Such is appellant's contention, and we think it is justified.

Respondent points to a reference made during the trial by appellant's counsel to a Mr. Brickey as proprietor of the store, and to another reference to Mr. Brickey and Mr. Hill as being connected with the store. Respondent argues the jury might reasonably have understood from the above argument that these two men would stand behind the judgment. But there was nothing in the evidence showing their financial worth, and the fact was conceded that the Mercantile Company was incorporated. There is no substance to this contention. Respondent's real theories are: (1) that the jury had a right to know an insurance company was interested in the case; (2) the error in the argument was cured by counsel's prompt withdrawal of it and his apology, and the court's instruction to the jury to disregard it; (3) the trial court was in a better position to determine the effect of the argument, and this court should abide by its decision.

There is no evidence whatever in this case as to the terms of the appellant's liability insurance policy, or the amount of coverage. The verdict of $30,000, or as reduced to $25,000, may have exceeded the insurance. But assuming it did not, what contingencies does a liability insurance policy cover? Obviously it is not a contract directly with the injured person insuring *him* against accident. On the contrary it protects the *insured* against his liability to the injured person for the accident. And that liability is for such amount (within the limits of the policy) as the injured person may recover against the insured as compensation for the injuries—not what a jury would award against someone else. As was said in Gore v. Brockman, 138 Mo. App. 231, 235, 119 S. W. 1082, "a litigant has a right

to his own personality, and the opposing party has no right to have the consideration of his claim influenced or measured by any other standard, so far as individuality is concerned, than that afforded by the party of whom he complains.''

Theoretically it should make no difference whether the judgment is to be paid by the defendant or his insurer, for the plaintiff's damages must be measured by fixed conditions—his injuries, pain and suffering, loss of earnings, etc.—and the award should be the same against either. But actually, everybody knows that there is a difference, and that juries are prone to return much larger verdicts where there is insurance coverage than where there is not, thus subjecting the defendant to a burden which the law does not impose on him, for it raises the amount of the recovery because of the insurer's ability to pay, and does not measure it alone by the nature and extent of the injuries, as the same would be assessed against the insured individually. These facts have been recognized in several recent decisions of this court. [Hannah v. Butts (1932), 330 Mo. 876, 884, 51 S. W. (2d) 4, 7; Olian v. Olian (1933), 332 Mo. 689, 698 59 S. W. (2d) 673, 677; Rytersky v. O'Brine (1934), 335 Mo. 22, 28, 30, 70 S. W. (2d) 538, 540, 541; Whitman v. Carver (1935), 337 Mo. 1247, 1254, 88 S. W. (2d) 885, 888.]

The first three of these four cases had been published when the instant cause was tried below. In the Hannah, Olian and Whitman cases the fact that the defendant had insurance protection was brought out by plaintiff in the opening statement or the testimony, on the theory that it had a bearing on the merits: as in the Hannah case, that an alleged release of the claim had been procured through the fraud of a claim agent of defendant's insurance carrier; and in the Olian and Whitman cases that the defendant had admitted his liability and said he was covered by insurance. And yet all four cases were reversed and remanded. The Olian case four times brands such evidence as ''highly prejudicial'' and once as ''highly objectionable.''

The Rytersky case was more like this one. In the *voir dire* examination of the jury counsel for defendant admitted the liability of his client was covered ''to a certain limit.'' The matter was not mentioned again during the trial until plaintiff's attorney made his argument to the jury. He told them: ''Don't worry about what is going to happen to this judgment. My friend says there is insurance to a limited amount here. Well, I will say to you right now, gentlemen . . . that whatever your verdict may be, that this boy (defendant) . . . won't have to pay a nickle of it to us. . . .'' This court declared: ''We can safely say, we think, that no plaintiff should be allowed to keep green before the minds of the jury throughout the trial or in the closing argument and after the legitimate purpose of such inquiry has been fully accomplished, the

fact that the real defendant carries liability insurance and will have to pay the judgment rendered since a corporate insurer is back of him.'' The case also held instructing the jury to disregard the argument was not enough to cure the error.

In the Whitman case the fact that defendant had liability insurance was brought out in plaintiff's testimony and denied by the defendant. In argument plaintiff's counsel told the jury to leave the collection of the judgment to him. The plaintiff contended that even if the reference to insurance was error it was not reversible because there was no claim that a case for the jury was not made, or that the verdict was excessive. This court said: ''But if a losing defendant in a damage case cannot complain of the injured party wrongfully getting before the jury that the defendant is covered by insurance, because the evidence is sufficient to support a finding for plaintiff and because the verdict is not excessive, then in such case, there would be no limit to which a plaintiff could go in advising the jury that the defendant was covered by insurance.''

Other cases cited by appellant where the judgment was reversed and the cause remanded because the fact that defendant had liability insurance protection was injected into the case, are: Robinson v. McVay (Mo. App.), 44 S. W. (2d) 238, 239; Crapson v. United Chautauqua Co. (Mo. App.), 27 S. W. (2d) 722; Bright v. Sammons (Mo. App.), 214 S. W. 425, 427; O'Hara v. Lamb Const. Co. (Mo. App.), 197 S. W. 163, 164; Trent v. Lechtman Printing Co., 141 Mo. App. 437, 452, 126 S. W. 238, 243. In the case last cited, the Kansas City Court of Appeals said: ''It is . . . obvious that the action of the court, in suffering counsel to poison the mind of the jury and then in telling the jury that his remarks were withdrawn from their consideration, cannot be regarded as sending a complete antidote after the poison.''

The respondent contends all the foregoing decisions are distinguishable from this one in that: the objectionable remarks or testimony were not withdrawn by plaintiff in the Hannah, Rytersky, Whitman, O'Hara and Trent cases; that in many of the cases the misconduct of plaintiff's counsel was persistent; and that in some of them defendant's objections were overruled. Her counsel cite twenty-five decisions which they contend support the trial court's action in refusing to discharge the jury. Among these are two fairly recent decisions of this court: Snyder v. Wagner Electric Mfg. Co., 284 Mo. 285, 311, 223 S. W. 911, 918, and Grindstaff v. Goldberg & Sons Structural Steel Co., 328 Mo. 72, 81, 40 S. W. (2d) 702, 706. The Snyder case declared: ''In the trial of such cases (defended by an insurance company) upon the merits the jury is entitled to know everything that affects the credibility of witnesses and the weight to be given their testimony, including their interest not only in the

subject-matter, but in the parties who are to profit or lose by the verdict. This goes not only to contractural relations with reference to the subject-matter of their testimony, but to their friendships and enmities. . . . While it may be . . . it would have been error to have disclosed to the jury the fact that an insurance company was bound by contract to indemnify the defendant for any amount recovered had it kept out of the suit, it chose to come before the trial jury in the place of the record defendant, and with its own witnesses.''

The same rule was held applicable in instances where an insurance company is the real defendant and conducts the defense, contacts the witnesses, engages expert witnesses or the like, in the Grindstaff case, last cited above, and in Schuler v. St. Louis Can Co., 322 Mo. 765, 775, 18 S. W. (2d) 42, 46; Huhn v. Ruprecht (Mo. Div. 2), 2 S. W. (2d) 760, 763(3); and Jablonowski v. Modern Cap Mfg. Co., 312 Mo. 173, 196, 279 S. W. 89, 96, the latter a decision by the court en banc. At the same time it must be remembered that sometimes, perhaps often, the record defendant has a real interest in the outcome of the action because if the damages awarded exceed his insurance protection that far they must be paid by him, and the fact that the insurance feature is injected into the case may cause that very thing to happen.

The rule to be deduced from all the foregoing cases is, we think, that the employment and payment of counsel by the insurance carrier alone will not make admissible evidence or argument that it has an interest in the case. Where it has done nothing that might influence or color the evidence on the merits, such proof should be excluded. And the proper practice is for plaintiff's counsel to interrogate defendant's counsel or the witnesses about these matters, where possible and if desired, in the absence of the jury, just as was done in this case and as the rule now is with reference to the *voir dire* examination of the jury panel, dying declarations, involuntary confessions and the like.

But whatever may be thought about the mere injection of proof that an insurance company is interested in the suit, counsel for respondent went clear beyond that in the instant case and made a direct appeal to the jury to return a $50,000 verdict because it would be paid by someone else. That would have been improper even if it had been proven an insurance company was carrying the whole liability. In the circumstances it was inexcusable. The argument was not made in heat and could not have been retaliatory because it was the beginning of respondent's opening argument. The prompt withdrawal of it and the apology of counsel was but an acknowledgment of the seriousness of the error. The instruction of the court to disregard the remark could not cure it. Respondent's injuries were

serious and permanent but in the face of an error as grave as that committed here, possibly affecting the whole case, we are convinced a mere *remittitur* would not suffice. If the respondent recovers a verdict again perhaps she should receive the whole amount awarded in the trial below. We do not attempt to say, but think the cause should be reversed and remanded, following Rytersky v. O'Brine, supra, 335 Mo. 1. c. 28, 70 S. W. (2d) 1. c. 540.

We cannot review the other cases cited by respondent without unduly extending this opinion which is already too long. Perhaps the three nearest in point are Brunk v. Hamilton-Brown Shoe Co., 334 Mo. 517, 534-5, 66 S. W. (2d) 903, 910, where the trial court did all defendant requested it to do; Sullivan v. St. L.-S. F. Ry. Co., 321 Mo. 697, 711, 12 S. W. (2d) 735, 740, where the remarks were provoked by counsel on the other side; and Bishop v. Music Plating Works, 222 Mo. App. 370, 381-2, 3 S. W. (2d) 256, 261 which is in conflict with the four decisions first cited at the beginning of this discussion unless the insurance company there took charge of the defense in the sense contemplated by the Snyder and Jablonowski cases, supra. The opinion does not show. Many other cases are cited on the proposition that the trial court has a large discretion in controlling the argument of counsel because it is in a better position to determine the · effect thereof; also cases holding a prompt retraction by counsel, or ruling and admonition by the trial court cured the error; and cases dealing with argument made in heat or in retaliation. None of these involved arguments referring to insurance coverage and appealing for a large verdict because of it. We think they are not controlling here.

Next, as to respondent's Instruction No. 2. It told the jury, in substance, 'that if they believed the Ford coupe in which respondent was riding "became and was in a position of imminent peril" of being struck by appellant's truck while crossing Mill Street, and that the driver of the truck saw, or by the exercise of the highest degree of care, could have seen the Ford coupe crossing Mill Street "approaching and in the aforesaid position of imminent peril" in · time thereafter to have averted the collision by the exercise of the highest degree of care, and failed to do so, their verdict should be for plaintiff. The petition does not plead and the instruction does not hypothesize obliviousness or inability to extricate herself on the part of respondent.

The writer ventures to renew here criticisms recently made of a similar instruction in Perkins v. Terminal Railroad Assn., 340 Mo. 868, 886, 896, 102 S. W. (2d) 915, 924, 930, this because it was thought by some of the judges of this court that the question was not raised by the appellant in that case. It is squarely raised here, and the instruction falls within the condemnation of both the dissenting

opinions in the Perkins case. It undoubtedly predicates liability on the failure of appellant's truck driver to avert the collision if he could have done so after seeing, or being bound in the exercise of the highest degree of care to see, the Ford coupe crossing Mill Street, *approaching* and in a position of imminent peril. That word approaching meant something in the instruction. According to its ordinary meaning it indefinitely extended the field within which vigilance under the humanitarian doctrine was exacted. But the law is that that duty does not arise *until* a situation of peril arises. [State ex rel. Fleming v. Bland, 322 Mo. 565, 572, 15 S. W. (2d) 798, 801.] The use of the word approaching in such instructions was impliedly condemned in State ex rel. Himmelsbach v. Becker, 337 Mo. 341, 347, 85 S. W. (2d) 420, 423, but that was a certiorari case and the question was only one of conflict. The phrase "coming into a position of imminent peril" was expressly condemned by the Kansas City Court of Appeals in Lakin v. C., R. I. & P. Ry. Co., 229 Mo. App., 461, 468, 78 S. W. (2d) 481, 485, 95 S. W. (2d) 1245. The question is fully covered in the Perkins case.

For the reasons assigned the judgment is reversed and the cause remanded. *Douglas, Gantt* and *Leedy, JJ.*, concur; *Tipton, C. J.*, and *Hays, J.*, concur in result; *Lucas, J.*, not sitting.