DONALD CABLE, Respondent, v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, a Corporation, Appellant, No. 41399—236 S. W. (2d) 328.

Court en Banc, February 12, 1951.

J. A. *Lydick* and *Hunter, Chamier & Motley* for appellant.

770

[black redacted block]

*C. M. Hulen* for respondent.

[black redacted block]

[328] DALTON, J.—Action for damages for personal injuries sustained by plaintiff when the truck he was operating and one of defendant's trains collided at a grade crossing. Verdict and judgment were for plaintiff for $8000.00 and defendant appealed.

The case of Flint v. Chicago, Burlington & Quincy Railroad Company, 357 Mo. 215, 207 S. W. (2d) 474, involved a passenger in plaintiff's [329] truck, but that cause was submitted on different assignments of negligence. Plaintiff's cause was submitted solely on negligence under the humanitarian doctrine in failing to warn of the approach of the train. Since it is contended that plaintiff failed to make a submissible case, we state the evidence most favorable to plaintiff and will disregard defendant's evidence unless it aids the plaintiff's case. A part of plaintiff's evidence appears to have been identical with the evidence in Flint v. Chicago, Burlington & Quincy Railroad Company, supra, and as to such evidence portions of the statement in the prior case have been adopted. Matters affecting the credibility, weight and value of the testimony of plaintiff and his witnesses and cross-examination concerning their testimony in the other case will be omitted.

The collision occurred a mile and a half east of Clark in Randolph county on August 14, 1945, about 1:40 o'clock in the afternoon. The day was bright and clear and the ground dry. The train was traveling in a northwest direction while plaintiff approached the crossing from the south. Plaintiff was driving a 1936 G.M.C. one and one-half ton truck with a high grain bed. The overall length of the truck was about 21 feet and 8 inches. Defendant's evidence tended to show that the distance from the ground level to the bottom of the windows in the truck doors was 57 inches; that the distance to the top of the windows was 71 inches; and that the outside top of the cab was approximately 80 inches above the ground.

Plaintiff testified that the glass in the truck doors had been rolled down and that there was no glass or opening in the cab of the truck from the back edge of the doors around to the back window of the cab. The back window was completely covered by the grain bed of the truck. Plaintiff was employed by Truesdale Brothers, who owned the truck. He was hauling grain from a field where threshing was being done north of the grade crossing in question. He was seated in the driver's seat on the left hand side of the truck and his passenger was on the right hand side. Plaintiff had driven east from Clark on a gravel road and had turned north on an open lane immediately east of a fence along the east side of what is hereinafter referred to as the Ward farm. Plaintiff approached defendant's right of way from the south at about 15 miles per hour.

The railroad extended in a straight line from the southeast to the northwest for more than half a mile on each side of the crossing. The lane and crossing had been open and used for many years by persons who farmed the lands north of the railroad. It was a little more than 1000 feet from the gravel road to the crossing. The crossing was planked solid and had been built and was being maintained by the railroad company. The railroad right of way was 100 feet wide and there was a corner post at the northeast corner of the Ward farm. This post was about 50 feet south of the center line of the railroad track. The right of way was fenced to the west of this post but not to the east. East of the crossing the right of way was covered with high weeds. The lane which plaintiff was traveling and the railroad right of way to his right approached each other at an acute angle, since the lane extended north and south and the railroad northwest to southeast. Further, the lane had formerly been to the west of the location of the north and south fence on the east side of the Ward farm, but it had been moved to the side of the fence. The lane made a short S curve around the corner post referred to, curving first to the left (west) and then back to the right and up an incline and over the crossing. One of defendant's witnesses said that the lane's turn to the left (west) around the corner post was "possibly between 30 or 45 degrees" and that it might veer to the left as much as 45

degrees. One witness said the lane turned directly west. The railroad tracks were located on an embankment about 4 feet above the level of the surrounding fields, which were flat and level. The crossing was 4 feet higher than the elevation of the lane at the corner post. Ten feet north of the corner post the lane was $2/10$ of a foot lower and the incline began near that point [330] and extended to the tracks, making the crossing 4 and $2/10$ feet higher than the low point in the lane.

Plaintiff testified that on the right hand side of the lane the weeds on the right of way were 6 to 8 feet high and you could not see through them. Another witness said that on the day following the collision he stood in the dip in the roadway "just as you leave the corner post" and that you could not see through the weeds. The weeds were of different types from 5 to 7 feet high, and they were thick. One of the defendant's witnesses fixed the height of the weeds at "approximately 4 to 6 feet, probably 7 feet, some of them" and said that the high vegetation lacked about 6 feet of reaching the edge of the ballast. There was also evidence that the weeds on the right of way on the east side of the approach to the crossing had been cut back approximately 10 feet.

Plaintiff had been over the roadway before and was familiar with the crossing. When he reached the corner post he turned to his left, following the roadway, so that his truck was facing in a northwest direction and the right side of his truck was "almost" parallel with the railroad tracks, "didn't lack too much." As he reached the depression in the roadway, he slowed down, practically stopped, changed gears, pulled to the right and proceeded slowly up the incline north to the crossing at not over three miles an hour. As he approached the crossing he could have stopped his truck within 2 feet. When the front end of his truck was 5 feet from the south rail of the track his truck was "just about" straightened out facing the crossing. You couldn't straighten the truck out in the length of the truck and he didn't know how far north of the depression he would have had to go to get the truck perpendicular with the track. When he was within 5 feet of the first rail he could still have stopped within 2 feet and have avoided the collision. The overhang of defendant's engine was shown to be approximately 32 inches.

While no issue of contributory negligence is presented, there is an issue as to whether plaintiff was apparently oblivious of the approach of the train. Plaintiff said he looked for a train when he started up the lane. The railroad embankment was then in plain view along the north side of the field. As he approached the corner post he continued to look for trains, but the weeds on the right of way obstructed a view of the embankment but would not have prevented a view of the train. He didn't hear a whistle at any time. About the time he got to the corner post, he asked his guest, who was sitting

on the right hand side of the truck, if he saw a train coming, the guest looked to the east and said that "he didn't see nothing." Plaintiff also looked to the east and did not see the train. When plaintiff shifted gears he looked to the right and to the left for approaching trains and saw none. He listened but he heard no bell or whistle and no noise of the approaching train. He continued to look and listen as he approached the tracks. If the train had whistled he could have heard it, and could have avoided a collision, but he did not hear or see the train until it was right on him and the front wheels of his truck were just over the south rail. The front end of the engine hit right behind the front wheel of the truck. The truck was wrecked and plaintiff injured.

Plaintiff testified that his hearing was reasonably good. The motor of the truck was in good shape, but that the bed rattled over rough ground "just about like any other truck." When plaintiff turned to the left around the corner post, the depression was on the right hand side of the roadway. When the right hand side of the truck reached and entered the depression, the right side of the truck was lower than the left side on which plaintiff was riding. Other evidence indicated that the roadway at this point was 4 to 6 inches lower on the right than on the left side and that with the tilt of the truck the right side of the top of the cab would have interfered with the operator's view to the right. Plaintiff said that "when the truck was turned kinda down I couldn't see." Plaintiff knew he was approaching a dangerous crossing. He knew the weeds were high and he knew that he had had trouble seeing every time he went [331] over the crossing. The weeds were so thick he could not see through them and that was the reason he proceeded slowly up to the crossing. He said that from the corner post on until you were right upon the tracks you couldn't see a train coming, if a train were there, and that the weeds kept him from seeing the train.

While plaintiff and his witness Heath heard no bell or whistle for this crossing, plaintiff had one eyewitness (Ward) who testified positively that no engine whistle was sounded and no bell rung for this crossing. "Never whistled or rang no bell at that crossing." Ward was about 300 yards from the scene of the collision. He owned the farm to the west of the lane and had just entered his field from the west on a tractor, intending to plow corn. He was about the center of the field between the gravel road and the railroad tracks, perhaps, 200 or 250 yards west of the lane and 300 yards southwest of the crossing. He saw the engine strike the truck and he immediately went to the scene of the collision. As Ward came out from his house east into his field, he heard the train whistle for the public crossing a half mile east of the crossing in question, "saw the steam and then heard the whistle." He stopped the tractor facing east, stood up on the platform on the tractor and watched the truck and train. He

observed the truck slacken speed near the corner post, just as it started to make the turn. The driver changed gears and slackened speed at the "little dip." He saw the truck driver "reach over and shift gears * * * before he made the circle back to go over the top." The truck proceeded slowly to the crossing, "the front wheel just got over the front rail and the cowcatcher * * * and the pilot together hit it." After the collision, a witness observed tire marks on the planks of the crossing, the marks "were about 6 to 8 inches over on the north side of the south rail."

Plaintiff further offered the testimony (depositions) of the engineer and fireman which showed that the train was running at a speed of between 33 and 39 miles per hour. The rated (timetable) speed was 50 miles per hour but they had slowed approaching the signal at Clark where they often had to stop at the Wabash crossing. The fireman was on the south side of the engine and saw the truck approaching; the engineer on the other side could not see it. The fireman said when he first saw the truck "it was about where the road curves before it makes a curve to come up on the track." He said that the engine was then about 200 or 250 yards east of the crossing and the truck about 15 or 20 yards south. He said: "When I saw the truck I turned to call the engineer's attention to a truck coming, just as he got hold of the whistle to blow it, and I didn't say nothing then, be impossible to make him hear—couldn't stop anyway." He said that just as he turned the engineer blew the whistle and kept it blowing (two longs and two shorts) until they reached the crossing. The engineer said he whistled because he saw men in the field north of the track and because he made a practice of whistling for private crossings.

The fireman said that the truck slackened speed 20 or 30 feet south of the crossing, "stopped or almost stopped," and then moved forward at accelerated speed, "just like you would put a truck or car in low gear and step on the gas." He said the truck hit the pilot beam of the engine, right back of the radiator of the truck, and was swung around against the side of the engine. The bell on the engine could be manually operated from the fireman's position.

Appellant contends that no submissible case was made and that the court erred in overruling defendant's motion for a directed verdict, "because there was no evidence that plaintiff was oblivious; no evidence that plaintiff's conduct and demeanor gave any reasonable appearances to the fireman that he was inattentive and dominated by a fixed intention to go across the crossing without regard for the consequences; no evidence that plaintiff was in a position of certain danger and imminent peril at a time when defendant, with the means and appliances at hand, could have sounded a warning which plaintiff could have heard in sufficient time to have stopped his truck [332]

short of a collision; and no evidence on the position of the engine or plaintiff's truck, or the speed of the truck.''

The evidence was sufficient to show that plaintiff was in fact oblivious to the approach of the train. He testified that he did not hear or see the train until the front wheels of his truck were over the south rail and the train was ''right on'' him. The fact that plaintiff drove upon the track in front of the approaching train was some evidence that he was in fact oblivious. It is hardly reasonable to believe that the truck would have been slowly driven into the path of the train, under the circumstances shown, if plaintiff had not been oblivious to the train's approach. Womack v. Missouri Pac. R. Co., 337 Mo. 1160, 88 S. W. (2d) 368, 371. Obliviousness is an essential element of a humanitarian negligence case based upon a failure to warn, since if plaintiff knew of the train's approach there would have been no duty to warn him and a warning would serve no useful purpose. Pentecost v. St. Louis Merchants' Bridge Terminal R. Co., 334 Mo. 572, 66 S. W. (2d) 533, 535.

We think that reasonable minds might well differ as to whether the facts and circumstances shown in evidence (general appearances open to the view of the fireman on the approaching train) showed that plaintiff was aware of the train's approach and apparently had an intention to stop short of its path or whether they indicated obliviousness to the impending collision and an apparent intention on plaintiff's part to proceed over the crossing. Plaintiff slowed down, practically stopped and shifted gears at a point 38 feet from the crossing. The truck at that time was headed northwest, almost parallel with the railroad tracks. It started up from that point and proceeded up the incline and its speed at no time exceeded 3 miles per hour. The driver's seat was on the left side of the truck with a high grain bed behind, which totally obstructed the rear window. On this evidence the grain bed of the truck was between the driver and the approaching train and an inference could be drawn that such fact was apparent to defendant's fireman. The evidence further shows that the truck started up from a near stop, when the train was approaching behind it and that the truck turned to the right toward the track and proceeded up the incline. There is no evidence that the speed of the truck was constant, only that it did not exceed 3 miles per hour. The inference could be drawn that the speed was accelerated from a near stop to a speed not exceeding 3 miles per hour. The fireman testified that the truck moved forward from ''a stopped or almost stopped'' position at an accelerated speed. Nothing in plaintiff's testimony contradicted that evidence. Further, the evidence shows that, when plaintiff pulled the truck around to his right to pass over the crossing, the truck was ''just about'' straightened out facing the track when the truck was only 5 feet from the south rail. The train was not approaching from the driver's side of the truck, but from the truck's

rear and from its right side as it was turning to the right toward the crossing. See Brown v. Kurn (Mo. Sup.), 161 S. W. (2d) 421, 422. The fireman saw the truck when "it was about where the road curves before it makes a curve to come up on the track." His own testimony shows that he promptly reacted to the situation observed, since he said "when I saw the truck I turned to call the engineer's attention to a truck coming." He saw the truck slow down and almost stop and then proceed at accelerated speed. The jury could believe the part of his testimony about seeing the truck when the engine was 200 or 250 yards from the crossing and about seeing it almost stop and then proceed at an accelerated speed, and disbelieve his testimony as to the sounding of the whistle and the location of the truck.

The evidence was sufficient to sustain a finding that plaintiff was in imminent peril from the time the truck started up and began to turn to the right for the crossing; and that reasonable appearances as viewed from the approaching train, would have induced such a conclusion in the mind of a reasonably prudent person. Womack v. Mo. Pac. R. Co., supra; Hoelzel v. Chicago R. I. & P. R. Co., 337 Mo. 61, 85 S. W. (2d) 126, 131; Hencke v. St. Louis & Hannibal R. Co., 335 Mo. 393, 72 S. W. (2d) 798, 799; [333] Perkins v. Terminal R. Ass'n., 340 Mo. 868, 102 S. W. (2d) 915, 919; Brown v. Kurn, supra; Scott v. Terminal R. Ass'n. of St. Louis (Mo. App.), 86 S. W. (2d) 116, 118.

Appellant insists that "plaintiff did not enter the danger zone until he was in a place where danger was imminently impending and the peril certain"; and that "plaintiff entered that danger zone when he reached à point about 5 feet from the near rail," when plaintiff had 2 feet within which to stop and some 4 inches of clearance from the overhang of the engine. This contention is based on the theory that there were no facts and circumstances in evidence to indicate to defendant's trainmen that plaintiff was oblivious to the approach of the train. Evidence of obliviousness, however, extended the danger zone, and imminent peril was not limited to unavoidable danger. State ex rel. Kansas City Public Service Co. v. Bland, 354 Mo. 868, 191 S. W. (2d) 660, 662; Janssens v. Thompson, 360 Mo. 351, 228 S. W. (2d) 743, 747. Appellant cites many cases where there was nothing in the evidence concerning general appearances to indicate obliviousness or to show that plaintiff was in any peril until it was too late for action to be taken to avoid a collision. Appellant cites Kirkpatrick v. Wabash R. Co., 357 Mo. 1246, 212 S. W. (2d) 764, 768; Elkins v. St. Louis Public Service Co., 335 Mo. 951, 74 S. W. (2d) 600; Guyer v. Mo. Pac. R. Co., 174 Mo. 344, 73 S. W. 584; Dody v. Lonsdale (Mo. App.), 158 S. W. (2d) 203; Thomasson v. Henwood, 235 Mo. App. 1211, 146 S. W. (2d) 88, and other cases. These cases upon their facts are easily distinguishable from the present case. The opinion in the Thomasson case, however, unduly

limits the danger zone under the facts there shown (146 S. W. (2d) 88, 93 (9) ) and it should not be followed. State ex rel. Kansas City Public Service Co. v. Bland, supra. In the Thomasson case the truck did slow down for the crossing, creating the appearance that the driver was not oblivious. It did not start up from some distance back and advance toward the crossing at an accelerated speed, as in this case.

■ Since it is shown that the fireman could see and did see the truck above the weeds, the presence of weeds on the right of way east of the crossing, whether they totally or partially obstructed the plaintiff's view of the approaching train, serves no essential part in determining whether a case of negligence under the humanitarian doctrine for failure to warn was made out. Except in so far as the presence of the weeds may have tended to indicate to the trainmen that plaintiff was probably oblivious and except as the presence of the weeds may have contributed to plaintiff being oblivious of the approach of the train, this evidence served no essential purpose. There is no evidence that the fireman saw either plaintiff or his passenger in the truck (Brown v. Kurn, supra) and the plaintiff said he did not see or hear the train until too late to avoid injury. We need not therefore consider appellant's contention that "plaintiff's oral evidence, attempting to prove that the weeds were an obstruction to his view, as he looked to the east (in the direction from which defendant's train was approaching) and as he traveled from the corner post * * * to the crossing" was not substantive and probative testimony to prove such fact because of conflict with plaintiff's photograph exhibits and known physical laws as to sign and vision.

■ Appellant further contends that "where a duty to warn is established, plaintiff must show that after the peril was discovered by defendant, that sufficient time remained for defendant, with the means at hand, to have sounded a proper warning and for plaintiff to have heard the warning, been alerted by it, and to have had time in which to be able to stop short of contact"; and that, under the evidence in this case, after the peril arose and defendant had notice of it, "hardly more than a second was available to defendant for a warning, and it was error to permit the jury to speculate as to whether such time was adequate."

The truck was approaching the crossing at not to exceed 3 miles per hour. At this maximum speed, 4.04 feet per second, it was some 8 seconds from the path of the train. The fireman saw the truck when the train was some 600 to 750 feet from the crossing and recognized the situation as sufficient to notify the engineer. [334] The train was approaching the crossing at 33 to 39 miles per hour, 48.4 to 57.2 feet per second, and was some 10 to 15 seconds away depending upon estimates of speed and distance, but it collided with the truck. The evidence was such as to sustain a finding that, after the peril was

discoverable and discovered, sufficient time remained for defendant to have sounded a warning and for the plaintiff to have heard it and been alerted and avoided the collision. Chawkley v. Wabash R. Co., ·317 Mo. 782, 789, 297 S. W. 20, 24, 27; Kick v. Franklin, 342 Mo. 715, 117 S. W. (2d) 284, 288. We hold that a submissible case was made for the jury.

■ Appellant assigns error on the giving of plaintiff's instruction 1, and contends that the instruction is confusing, indefinite and uncertain; that it gave the jury a roving commission, "unduly extending the position of imminent peril to· any time and place south of the crossing"; that it permitted the jury to guess and speculate as to the time and place where plaintiff came into peril; and that it failed "to· require a finding by the jury that if a warning had been sounded, it would have been effective in avoiding the collision by awakening the plaintiff and causing him to. react in sufficient time to stop clear of the engine."

The instruction, plaintiff's principal one submitting the case to the jury, submitted a finding that on or about the 14th day of August, 1945, "plaintiff was driving the truck mentioned in evidence along the road, and toward the railroad crossing mentioned in evidence"; that the crossing had long been in use over defendant's tracks; that "at said time and place, defendant, through its agents, servants and employees, was operating a railroad train in a westerly direction, toward said crossing and along the railroad tracks mentioned in evidence; and if you further find and believe that at said time and place, plaintiff was in a position of imminent peril of being struck and injured by defendant's train, and was unaware of the approach of said train and that the defendant's agents * * * in charge of said train saw, or by the exercise of ordinary care could have seen that plaintiff was in a position of imminent peril of being struck and injured by said train, and was unaware of the approach of said train, and · would have had time thereafter * * * to have sounded a warning * * *; and that by so doing, the striking of the truck * * * and the injury to plaintiff would have been avoided," et cetera.

We think the instruction was prejudicially erroneous in that it submitted no proper finding of facts to guide the jury in determining the issuable fact of imminent peril or in reaching a conclusion as to ·when, where, and how the position of peril came into existence, or as to when the duty of the defendant under the humanitarian doctrine arose to sound a warning. Smithers v. Barker, 341 Mo. 1017, 111 S. W. (2d) 47, 51. From a finding that plaintiff was driving his truck along the road *toward* the railroad crossing and defendant was operating its .train in a westerly direction *toward* said crossing, the instruction permitted and authorized a finding that "*at said time and place,* plaintiff was in a position of imminent peril of being struck

and injured by defendant's train.'' (Italics ours.) On the facts submitted the jury may have reached a conclusion that plaintiff was in a position of imminent peril prior to the time that he stopped, or almost stopped, and before he proceeded at an accelerated speed toward the crossing. The instruction permitted a finding of imminent peril when plaintiff was only *approaching* a position of imminent peril, that is, when plaintiff was approaching the crossing and prior to the time that, under plaintiff's own evidence, the perilous situation arose and prior to the time of the coming into existence of the reasonable appearances, shown by plaintiff's own evidence, which imposed a duty upon the defendant to act under the humanitarian doctrine. Buehler v. Festus Mercantile Co., 343 Mo. 139, 119 S. W. (2d) 961, 970; Smithers v. Barker, supra; Poague v. Kurn, 346 Mo. 153, 140 S. W. (2d) 13, 19(9); Roach v. Kansas City Public Serv. Co. (Mo. Sup.), 141 S. W. (2d) 800, 802; Kimbrough v. Chervitz, 353 Mo. 1154, 186 S. W. (2d) 461, 465(6). The instruction ''indefinitely [335] extended the field within which vigilance under the humanitarian doctrine was exacted'' and the giving of it was reversible error. Buehler v. Festus Mercantile Co., supra, 119 S. W. (2d) 961, 970.

On the record presented, the plaintiff's evidence would not sustain a finding that plaintiff was in imminent peril prior to the time of plaintiff's near stop to shift gears, nor prior to the time he began the ascent of the incline to the crossing at an accelerated speed. No duty arose under the humanitarian doctrine requiring defendant to act until the existing circumstances would have made it reasonably apparent to defendant's trainmen that plaintiff was oblivious of the approach of the train and that he intended to pass over the crossing in the path of the train. Womack v. Missouri Pac. R. Co., supra; State ex rel. Fleming v. Bland, 322 Mo. 565, 15 S. W. (2d) 798, 801.

Respondent relies particularly on the case of Perkins v. Terminal R. Ass'n. (En Banc), 340 Mo. 868, 102 S. W. (2d) 915, 920, 923, to support the giving of Instruction 1. The instruction in that case, after submitting certain facts, continued, ''and if you further find that *at and prior to the collision* aforesaid,'' plaintiff and said truck were *approaching and in a position* of imminent peril, ''in time thereafter for the defendant,'' et cetera. (Italics ours.) It was contended in that case that the instruction failed to require a finding as to where the position of peril began. The court said: ''Nor do we think the instruction is erroneous because it failed to require a finding as to where the position of peril began. * * * The exact point where the position of imminent peril began was for the jury to determine under the evidence.'' Our holding in this case is not in conflict with that decision. The use of the word ''approaching'' was not ruled in that case because not raised by appellant. (See Buehler v. Festus Mercantile Co., supra, 119 S. W. (2d) 961, 970, where such

an instruction was subsequently disapproved). In the case of Smithers v. Barker, supra, we said: "The Perkins case does not authorize a misstatement as to where a position of imminent peril begins, under the facts of a case." (111 S. W. (2d) 47, 51).

The judgment is reversed and the cause remanded. All concur.